UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BARBARA EBER-SCHMID,                                  :

                         Petitioner,                        :                09 Civ. 8036 (BSJ) (AJP)

                -against-                           :

ANDREW M. CUOMO, et al.,                              :

                      Respondents.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROBERT SCHMID,                                        :

                          Petitioner,                        :                09 Civ. 8038 (BSJ) (AJP)

                -against-                           :

                                               **REPORT AND RECOMMENDATION**

ANDREW M. CUOMO, et al.,                              :

                      Respondents.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Barbara S. Jones, United States District Judge:**

           Petitioners Barbara Eber-Schmid and Robert Schmid seek writs of habeas corpus

from their December 7, 2007 convictions, following guilty pleas in Supreme Court, New York

County, of fourth degree grand larceny and sentences of three years conditional discharge. (Dkt.

H:\OPIN\EBER-SCHMID

No. 1: Petition ["Pet."] ¶¶ 1-6.)[1]   Read liberally, Schmid and Eber-Schmid's habeas petitions allege that:  (1) their guilty pleas were not voluntary because their former attorney "threaten[ed] to withdraw as counsel at the plea allocution if Petitioner[s] did not agree to plead guilty" (Pet. ¶ 12(4); Dkt. No. 2: Pet. Br. at 22-23); and (2) they were denied the effective assistance of counsel because: (a) they were not "adequately apprised of the potential for a conflict of interest" resulting from multiple concurrent representation because "the [trial] court never made the constitutionally required on-the-record inquiry despite the fact that [they were] jointly represented . . . in a single criminal action" (Pet. ¶ 12(1); Pet. Br. at 12-17; Dkt. No. 12: Pet. Traverse at 4-8); (b) their former attorney's conflict of interest "adversely affected" his performance (Pet. Br. at 4-6; Pet. Traverse at 4-6); (c) their former attorney failed "to investigate documentary evidence that was available prior to Petitioner[s'] guilty plea[s] which would have exculpated" them (Pet. ¶ 12(2)); Pet. Br. at 18-20; Pet. Traverse at 8-9); and (d) their former attorney "affirmatively misled Petitioner[s] and induced Petitioner[s] to plead guilty telling Petitioner[s] that a guilty plea and payment of restitution in the criminal case would take restitution 'off the table' in the collateral civil case, while failing to mention the devastating collateral consequence of the guilty plea with regard to [their] liability in the civil matter" (Pet. ¶ 12(3); Pet. Br. at 20-22).

For the reasons set forth below, Schmid and Eber-Schmid's habeas petitions should be <u>DENIED</u>.

---

[1]      The parties have submitted separate but virtually identical paperwork in support and opposition to each petition. Unless otherwise indicated, all citations are to petitioner Eber-Schmid's file, Docket No. 09 Civ. 8036.

H:\OPIN\EBER-SCHMID

## FACTS

### Background

Between 1987 and June 2005, Barbara Eber-Schmid was the Executive Director of the New York City Tree Consortium, Inc. ("TNY" or "Trees"), a not-for-profit corporation dedicated to promoting urban forestry.  (Dkt. No. 2: Pet. Br. at 5; Dkt. No. 11: State Br. at 2.)  Her husband, Robert Schmid, operated his own consulting firm (Schmid Associates), that provided computer related services to private clients including TNY.  (Pet. Br. at 5.)

In January 2007, TNY contacted the Manhattan District Attorney's Office and accused Schmid and Eber-Schmid of embezzling over $450,000 from TNY.  (Pet. Br. at 5-6; State Br. at 2.)  Specifically, TNY alleged that  Schmid and Eber-Schmid had used a corporate American Express credit card to pay for personal expenses, that Schmid had used TNY resources to purchase and operate equipment for his computer company, and that Schmid and Eber-Schmid had taken personal loans from TNY bank accounts but never repaid them.  (Pet. Br. at 5-6; State Br. at 2.)

Schmid and Eber-Schmid waived their right to grand jury indictments (Dkt. No. 3: Ex. E: Schmid Waiver of Indictment; Ex. F: Eber-Schmid Waiver of Indictment),[2] and were charged with fourth degree grand larceny by Superior Court Informations.  (Ex. H:  Schmid Information; Ex. I: Eber-Schmid Information.)  Together, Schmid and Eber-Schmid retained the law firm of Sklover & Donath, LLC to represent them.  (Pet. Br. at 6; State Br. at 2.)  David Stand, Esq., an experienced

---

[2]      All references to exhibits, unless otherwise indicated, are to the September 18, 2009 Affidavit of Robert Ray, Esq. in support of the petitions.  (Dkt. No. 3.)

criminal attorney, and Alan Sklover, Esq., a partner at the firm, undertook to represent them in both the criminal matter and a corresponding civil suit brought by TNY. (Pet. Br. at 6; State Br. at 2.)

### The Plea Agreement and Guilty Pleas

On October 24, 2007, Schmid and Eber-Schmid entered into separate but identical written plea agreements with the District Attorney's Office. (Dkt. No. 3: Ex. J: Schmid Plea Agreement; Ex. K: Eber-Schmid Plea Agreement [collectively, "Plea Agreements"].) According to the terms of the agreements, Schmid and Eber-Schmid would plead guilty to fourth degree grand larceny, jointly pay $52,163.96 in restitution to TNY, and waive their rights to appeal. (Plea Agreements ¶ 2.) In exchange, the DA's Office would recommend that "they be sentenced to an agreed upon conditional discharge." (Plea Agreements ¶ 4.)

In addition to acknowledging their guilt, the plea agreements provided:

> [Defendants'] entry into this agreement is knowing and voluntary after discussion and consultation with [their] attorney, Alan Sklover, Esq. [Each defendant] understands that [his/her spouse] is also accepting a plea offer to plead guilty to Grand Larceny in the Fourth Degree, a Class E felony, and will be jointly and severally liable for the $52,163.96 in restitution to TNY. [Each defendant] understands that [his/her spouse] is also represented in [his/her] guilty plea by Alan Sklover, Esq.[, and have] affirmatively chosen to have mutual representation. [Each defendant] waives any claim of conflict in Mr. Sklover's mutual representation of [himself/herself and his/her spouse].

(Plea Agreements ¶ 8.)

Also on October 24, 2007, Schmid and Eber-Schmid pled guilty to fourth degree grand larceny before New York County Supreme Court Justice Ruth Pickholz. (Dkt. No. 3: Ex. G: Plea Hearing Transcript ["Tr."] 1-3.) David Stand had recently left the Sklover firm, so Schmid and

Eber-Schmid were represented by Alan Sklover.  (Dkt. No. 11: State Br. at 4; Ex. Y: Stand Aff. ¶ 3; see also Tr. 2.)  ADA Rahul Kale submitted executed copies of the proposed plea agreements for Justice Pickholz's review.  (Tr. 2.)  According to ADA Kale, Judge Bartley had previously reviewed and approved the agreements and adjourned the case for waiver of indictment and plea.  (Tr. 2; Ex. A: 5/4/09 Justice Pickholz Decision at 2.)  ADA Kale summarized the terms of the plea agreements, explaining that Schmid and Eber-Schmid would be sentenced to terms of conditional discharge provided they made restitution of $52,163.96 by their sentence date.  (Tr. 2-3.)  In the event they did not fulfill the terms of their agreements, Schmid and Eber-Schmid would be sentenced at the court's discretion.  (Tr. 3.)

> Justice Pickholz first inquired how Schmid and Eber Schmid wanted to plead:

> THE COURT:  Barbara Eber-Schmid and Robert Schmid, the District Attorney has filed with the Court Superior Court Information Number 4896 of 2007 and 4897 of 2007, charging you with grand larceny in the fourth degree.

> Robert Schmid, how do you plead, guilty or not guilty?

> MR. SCHMID:  Guilty.

> THE COURT:  Barbara Eber-Schmid, how do you plead, guilty or not guilty?

> MS. EBER-SCHMID:  Guilty.

(Tr. 4.)  Justice Pickholz advised Schmid and Eber-Schmid of the rights they were giving up by pleading guilty:

> THE COURT:  All right, do you both understand that by pleading guilty, you are giving up your right to go to trial?

MR. SCHMID:  Yes, your Honor.

MS. EBER-SCHMID:  Yes, your Honor.

THE COURT:  Are you both pleading guilty because you are guilty and for no other reason?

MR. SCHMID:  Yes, your Honor.

THE COURT:  And you are giving up your right to tell your side of the story, you are giving up your right to cross examine witnesses against you.

Do you understand that?

MR. SCHMID:  Yes, your Honor.

THE COURT:  Ma'am.

MS. EBER-SCHMID:  Yes, your Honor.

(Tr. 4-5.) Justice Pickholz next discussed the terms of Schmid and Eber-Schmid's plea agreements,

including the voluntariness of their pleas:

THE COURT:  Has anybody forced or threatened you to plead guilty?

MR. SCHMID:  No, your Honor.

MS. EBER-SCHMID:  No.

THE COURT:  And have any promises been made other than the promises regarding this agreement, and that promise is?

[ADA] KALE:  If they repay the 52,000 some odd dollars, they will be sentenced to conditional discharge.

THE COURT:  Any other promises?

MR. SCHMID:  No, your Honor.

(Tr. 5-6.)  Finally, Justice Pickholz asked Schmid and Eber-Schmid to describe what they had done

wrong.  Schmid stated:

> [B]eginning in 1999 until June 2005, I used Trees New York credit cards to make
> personal purchases that were totally unauthorized by TNY's board of directors and
> unrelated to TNY's business.  The purchases included vacations, meals at restaurants,
> expenses related to personal transportation and purposes for the benefit of . . . myself.
> I stated I was paying back Trees New York for the purchases, but had no intention
> of doing so and never did pay for the unauthorized purchases.  I stole $52,163.96.

(Tr. 6.)  Similarly, Eber-Schmid declared:

> From January '99 until June '05, I used Trees New York's credit cards to make
> personal purchases that were unauthorized by TNY's board of directors and unrelated
> to TNY's business.  The purchases included vacations, meals at restaurants, expenses
> related to personal transportation and purchases for the benefit of my husband.  I
> knew my husband stated he was going to repay TNY for the purchases, but had no
> intention of doing so and never did pay for the unauthorized purchases. $52,163[.]96
> was stolen.

(Tr. 6-7.)[3/]

> Justice Pickholz adjourned sentencing for approximately one month to allow Schmid

and Eber-Schmid to make the restitution payment to TNY.  (Tr. 7-8.)

**<u>Sentencing</u>**

> On December 7, 2007, Schmid and Eber-Schmid appeared before Justice Pickholz

for sentencing.  (Dkt. No. 3: Ex. L: Schmid Sentencing Order; Ex. M: Eber-Schmid Sentencing

Order [collectively, "Sentencing Orders"].)  In accordance with the terms of their plea agreements,

Schmid and Eber-Schmid executed waivers of their right to appeal.  (Ex. N: Schmid Waiver of Right

---

[3/]     Both petitioners' allocutions were as set forth in their plea agreements.  (<u>See</u> Plea Agreements
¶ 3.)

to Appeal; Ex. O: Eber-Schmid Waiver of Right to Appeal.)   Schmid and Eber-Schmid acknowledged that they signed the waivers "knowingly and voluntarily after having been advised by the Court and after consulting with [their] attorney."  (Id.)  Schmid and Eber-Schmid further affirmed that "[o]ne of the reasons [they] have agreed to give up [their] appellate rights is because [they are] receiving certain benefits, including, but not limited to, a favorable plea and sentence agreement[s]."  (Id.)

Having made restitution to TNY, and pursuant to the terms of their plea agreements, Schmid and Eber-Schmid each were sentenced to a three year term of conditional discharge. (Sentencing Orders.)

**Petitioners' C.P.L. § 440 Motions**

On December 5, 2008, Schmid and Eber-Schmid filed a joint motion pursuant to C.P.L. § 440 to vacate their convictions.  (Dkt. No. 3: Ex. P: 12/5/08 Ray Aff.; see also Dkt. No. 2: Pet. Br. at 11; Dkt. No. 11: State Br. at 6.)  Represented by new counsel, Schmid and Eber-Schmid asserted numerous constitutional grounds for their motion.  (12/5/08 Ray Aff. ¶¶ 2-9; State Br. at 6.) In support of their motions, Schmid and Eber-Schmid submitted affidavits from:  (1) Robert Ray (12/5/08 Ray Aff.); (2) Robert Schmid (Ex. Q: 12/5/08 Schmid Aff.; Ex. S: 3/17/09 Schmid Reply Aff.); (3) Barbara Eber-Schmid (Ex. R: 12/5/08 Eber-Schmid Aff.; Ex. T: 3/17/09 Eber-Schmid Reply Aff.); (4) David Stand (Ex. Y: 3/18/09 Stand Aff.); and (5) Steven Rabinowitz (Ex. Z: 3/18/09 Rabinowitz Aff.).

First, Schmid and Eber-Schmid alleged that their former counsel, Alan Sklover, labored under an undisclosed conflict of interest that rendered his legal counsel ineffective. (12/5/08 Ray Aff. ¶¶ 2-4; 12/5/08 Schmid Aff ¶¶ 2, 10; 12/5/08 Eber-Schmid Aff. ¶¶ 2, 9.) According to petitioners, Eber-Schmid authorized Schmid's use of the TNY credit card. (12/5/08 Ray Aff. ¶ 4; 12/5/08 Schmid Aff. ¶¶ 5, 10; 12/5/08 Eber-Schmid Aff. ¶¶ 5, 9.) Thus, Schmid had a "complete defense" to the charged crimes – i.e., that his use of the card was expressly authorized and therefore not criminal. (12/5/08 Ray Aff. ¶¶ 4-5; 12/5/08 Schmid Aff. ¶ 10; 12/5/08 Eber-Schmid Aff. ¶ 9.) However, according to their motion, because Sklover owed a duty of loyalty to Eber-Schmid and because Schmid's defense would have been harmful to her, Sklover never disclosed or explored that defense. (12/5/08 Ray Aff. ¶¶ 4-5; 12/5/08 Schmid Aff. ¶ 10; 12/5/08 Eber-Schmid Aff. ¶ 9.) "Had anyone advised [them] of the Sklover firm's conflict in presenting a full and complete defense to the charges against [Schmid] by stating that all of the charges made on [TNY's] American Express Card were authorized by [Eber-Schmid], [they] would have not waived the conflict of interest and permitted the Sklover firm to represent" them. (3/17/09 Schmid Reply Aff. ¶ 8; 3/17/09 Eber-Schmid Reply Aff. ¶ 6.)

Second, petitioners argued that Justice Pickholz failed in her duty under People v. Gomberg, 38 N.Y.2d 307, 379 N.Y.S.2d 769 (1975), to conduct an on-the-record inquiry into Sklover's apparent conflict of interest. (12/5/08 Ray Aff. ¶ 2.) Because they were unaware of the conflict (or even the potential for such a conflict to prejudice their defense), and Justice Pickholz

failed "to ensure on the record that [they] knowingly waived the conflict," Schmid and Eber-Schmid

allege that they were entitled to vacate their pleas.  (12/5/08 Ray Aff. ¶ 3.)

    Third, Schmid and Eber-Schmid alleged that Sklover's performance was deficient

because he failed to investigate exculpatory documents that would have absolved Schmid and Eber-

Schmid of any criminal liability.  (12/5/08 Ray Aff. ¶ 6; Rabinowitz Aff. ¶ 3.)  Specifically, Schmid

and Eber-Schmid asserted that certain documents within TNY's possession demonstrated that all

personal expenses charged to TNY's credit card had been repaid. (12/5/08 Ray Aff. ¶ 6; Rabinowitz

Aff. ¶ 5; 12/5/08 Schmid Aff. ¶¶ 7-8; 12/5/08 Eber-Schmid Aff. ¶ 5; 3/17/09 Schmid Reply Aff. ¶ 4;

Ex. AB: 3/17/09 Schmid Reply Aff. Ex. C: Repayment Records.)  According to petitioners, Sklover

made no attempt to review TNY's books and records.  (12/5/08 Ray Aff. ¶ 6; 12/5/08 Schmid Aff.

¶¶ 7-8; 12/5/08 Eber-Schmid Aff. ¶¶ 6-7.)  According to petitioners, had Sklover investigated these

documents, he would have realized that  Schmid and Eber-Schmid were innocent and they would not

have pled guilty.  (12/5/08 Ray Aff. ¶¶ 6-7; 3/17/09 Schmid Reply Aff. ¶ 7; 3/17/09 Eber-Schmid

Reply Aff. ¶ 5.)

    Fourth, Schmid and Eber-Schmid claimed that counsel mis-informed them as to the

collateral consequences that their guilty pleas would have in regard to TNY's concurrent civil lawsuit

against them.  (12/5/08 Ray Aff. ¶ 8; 12/5/08 Schmid Aff. ¶¶ 9; 12/5/08 Eber-Schmid Aff. ¶ 8.)

According to Schmid and Eber-Schmid, Sklover told them that any amount they paid in restitution

to satisfy their criminal liability would be "'off the table'" in TNY's civil suit against them.  (12/5/08

Schmid Aff. ¶ 9; 12/5/08 Eber-Schmid Aff. ¶ 8.)  Sklover failed to tell them that their "guilty plea[s]

would be used as conclusive evidence of liability in support of [TNY's] claims against [them] in the civil litigation." (12/5/08 Schmid Aff. ¶ 9; 12/5/08 Eber-Schmid Aff. ¶ 8.) Had anyone told them that their guilty pleas would preclude them from disputing the issue of liability in TNY's civil case, they "would have instead risked the possibility of indictment and trial." (3/17/09 Schmid Reply Aff. ¶ 6; 3/17/09 Eber-Schmid Reply Aff. ¶ 4.)

Lastly, petitioners asserted that their pleas were not voluntary because they were coerced by their counsel. (12/5/08 Ray Aff. ¶ 9; 12/5/08 Schmid Aff. ¶¶ 11-12; 12/5/08 Eber-Schmid Aff. ¶¶ 10-11.) Specifically, Schmid and Eber-Schmid claimed that Sklover threatened to withdraw from representation on the morning of their plea allocution if they refused to plead guilty. (12/5/05 Ray Aff. ¶ 9; 12/5/08 Schmid Aff. ¶ 11; 12/5/08 Eber-Schmid Aff. ¶ 10.) Petitioners stated that Sklover's threat frightened them to such a degree that they agreed to plead guilty even though they were not guilty. (12/5/08 Schmid Aff. ¶ 12; 12/5/08 Eber-Schmid Aff. ¶ 11.) When asked by Justice Pickholz whether anyone had forced or threatened them to plead guilty, they said "'no'" for fear that Sklover would "withdraw from further representing [them] on the spot." (12/5/08 Schmid Aff. ¶ 12; 12/5/08 Eber-Schmid Aff. ¶ 11.)

In opposition to Schmid and Eber-Schmid's § 440 motions, the State submitted affidavits from: (1) ADA Rahul Kale (Ex. V: Kale Aff.); (2) Alan Sklover (Ex. U: Sklover Aff.); and (3) Sharee Donath, a partner at the Sklover firm (Dkt. No. 10: Dannelley Aff. Ex. G at 33-34: Donath Aff).

According to the State, TNY lodged a complaint with the Manhattan District Attorney's office in January 2007, accusing Schmid and Eber-Schmid of stealing over $450,000. (Sklover Aff. ¶ 3; Kale Aff. ¶ 2.)  TNY cooperated with the DA's Office throughout the investigatory process, making available their audit reports, employees, directors and board minutes. (Kale Aff. ¶ 2.) The DA's Office focused their investigation on petitioners' unauthorized use of TNY's American Express card.  (See Kale Aff. ¶¶ 2-5.)  As part of the investigation, the DA's Office subpoenaed Schmid and Eber-Schmid's bank account records, as well as TNY's bank and credit card statements. (Kale Aff. ¶ 2.) According to the statements, Schmid and Eber-Schmid routinely used the TNY American Express card for personal expenses, including lavish vacations and meals.  (Kale Aff. ¶ 4.) However, payment receipts showed that TNY's bank accounts were used to pay the American Express bill. (Kale Aff. ¶¶ 2, 4.)  Although Schmid and Eber-Schmid ultimately repaid TNY for some of their purchases (Kale Aff. ¶ 5), the DA's Office maintained that petitioners never intended to repay a substantial amount of the money (Ex. C: Schmid Felony Compl.; Ex. D: Eber-Schmid Felony Compl.)  According to the  the DA's office, Schmid and Eber-Schmid stole in excess of $50,000. (Kale Aff. ¶ 5.)  Interviews with TNY employees revealed that Schmid and Eber-Schmid had attempted to "cover up their theft."  (Kale Aff. ¶ 4.)

Beginning in March 2007, David Stand and ADA Kale engaged in extensive plea negotiations.  (Kale Aff. ¶ 3; Sklover Aff. ¶ 6; see also, Ex. X: Schmid/Stand Emails.)  At the outset, ADA Kale raised the issue of joint representation and was assured that Schmid and Eber-Schmid had been informed that such representation "can be prejudicial in the case of two people defending against

charges arising from one set of alleged criminal activities" and had affirmed that they wanted the Sklover firm to represent them both.  (Sklover Aff. ¶ 5; Kale Aff. ¶ 3.)  As part of the negotiation process, ADA Kale provided Stand with a list of credit card charges, totaling over $80,000, containing only those purchases deemed to be "brazen thefts."  (Kale Aff. ¶ 5; see also Ex. X: 7/31/07 Pinto Email; Ex. W: 3/17/09 Schmid Reply Aff. Ex. B: Amex Charge Spreadsheet.)  Moreover, ADA Kale informed Stand that he had discovered over $17,000 worth of TNY checks payable to "cash," believed to represent additional funds stolen by Schmid and Eber-Schmid.  (Ex. X: 8/1/07 Stand Email.)  Stand countered, disputing "line by line dollar amounts questioned by ADA Kale."  (Sklover Aff. ¶ 6.)  According to Schmid, many of the charges listed were either legitimate business expenses or had been repaid.  (Kale Aff. ¶¶ 4-5; Ex. X: 8/6/07 Stand Email; see also Sklover Aff. ¶ 6.)  In time, ADA Kale became frustrated at "these back and forth exchanges and the associated 'nitpicking' as there [were], according to ADA Kal[]e, many charges for which they did not include and many others for which they gave [petitioners] the benefit of the doubt."  (Ex. X: 8/6/07 Stand Email.)

On July 7, 2007, in a final attempt to avoid felony charges, Schmid and Eber-Schmid and their counsel met with ADA Kale.  (Kale Aff. ¶ 6; Sklover Aff. ¶ 5.)  ADA Kale again "raised the issue of the possible conflict of interest that might arise as a result of the Sklover firm representing both defendants."  (Kale Aff. ¶ 6; Sklover Aff. ¶ 5.)  He instructed Schmid and Eber-Schmid to "step out of the room and discuss th[e] matter" with Stand and Sklover.  (Kale Aff. ¶ 6.)  After speaking to the attorneys, Eber-Schmid returned to Kale's office and stated that she saw no conflict and wished to proceed under joint representation.  (Id.)  Similarly, Schmid spoke with the attorneys and affirmed

that he wanted the Sklover firm to continue representing both he and his wife.  (Id.)  By the end of the meeting, it was clear to ADA Kale that Schmid and Eber-Schmid were criminally liable for their conduct.  (Id.)  ADA Kale represented that if Schmid and Eber-Schmid would waive indictment and plead guilty by Superior Court Information, the People would not seek incarceration.  (Kale Aff. ¶ 5.) If, on the other hand, Schmid and Eber-Schmid did not want to accept a plea, ADA Kale suggested he would "bring the matter before the Grand Jury" for indictment.  (Ex. X: 8/6/07 Stand Email.)

Sklover explained to Schmid and Eber-Schmid that if they accepted the plea agreement offered by the DA's Office they would not go to jail, but that if they chose to proceed to trial, they faced the possibility of incarceration.  (Sklover Aff. ¶¶ 4, 7.)  Sklover also explained the collateral consequences of pleading guilty.  (Sklover Aff. ¶ 4.)  Specifically, he told Schmid and Eber-Schmid that "the issue of [civil] liability would likely be precluded once they pleaded guilty in connection with the criminal matter," but that any amount they paid in restitution to satisfy the criminal case would be subtracted from the damage award in the related civil action.  (Sklover Aff. ¶ 4.)  Sklover and Stand made clear to Schmid and Eber-Schmid that the choice of whether or not to plead guilty was petitioners' and that counsel would defend them if they chose to go to trial.  (Sklover Aff. ¶ 7.) Because Schmid and Eber-Schmid's primary interest was to avoid incarceration (Sklover Aff. ¶ 4), they chose the certainty of the plea offer over the considerable risk of proceeding to trial (Sklover Aff. ¶¶ 7-8).

On December 7, 2007, before their sentencing, Sklover advised Schmid and Eber-Schmid of their right to withdraw their guilty pleas.  (Donath Aff. ¶¶ 1-3)  Sklover explained "that

the choice was theirs alone, and that [he] would continue to act as their counsel, and defend them, if they decided to go to trial." (Donath Aff. ¶ 4.)  Schmid and Eber-Schmid understood the effects their guilty pleas would have on the pending civil litigation, but "decided that the risk of potential incarceration following a trial outweighed the disadvantages of proceeding with their guilty pleas." (Donath Aff. ¶ 5.)

**Justice Pickholz's Denial of Petitioners' C.P.L. § 440 Motions**

On May 4, 2009, Justice Pickholz denied Schmid and Eber-Schmid's § 440 motion. (Ex. A: 5/4/09 Justice Pickholz Decision.)  According to Justice Pickholz, Schmid and Eber-Schmid "offered no support for their contentions" which were contradicted by the record. (5/4/09 Justice Pickholz Decision at 6.)

First, Justice Pickholz dismissed "the possibility that [Schmid and Eber-Schmid's] pleas were the product of coercion":

> Their claim that Mr. Sklover told them that he would withdraw as their attorney if they did not plead guilty is belied by their denials at the time of their pleas that they had been threatened or coerced to plead guilty.  Furthermore, they had ample opportunity to complain of any pressure prior to or at the time of sentence, but did not do so. . . . There was good reason for them to accept the plea offer.  As they conceded in the plea waivers that they signed, they were obtaining a favorable disposition. Although their pleas removed the issue of liability from their civil case, they were spared the possibility of going to jail.  Further, the amount that they agreed to pay in restitution would be subtracted from any judgment that would be obtained in the civil case.  The promised sentence - a three-year conditional discharge and restitution - was extremely lenient.  If Mr. Sklover indeed told them that they would might well go to jail if they did not plead guilty, his advice was sound and did not constitute coercion.

(5/4/09 Justice Pickholz Decision at 6.)

Next, Justice Pickholz rejected Schmid and Eber-Schmid's claims "that they were unaware of a potential conflict of interest." (5/4/09 Justice Pickholz Decision at 7.) Justice Pickohlz noted that the Kale and Sklover affidavits directly contradicted Schmid and Eber-Schmid's claims, and observed that Stand's affirmation, submitted on petitioners' behalf, was conspicuously silent on the issue. (Id.) Moreover, Justice Pickholz also cited the waiver clauses in the executed plea agreements as proof that Schmid and Eber Schmid had waived any claim of prejudice arising from the joint representation:

> The plea agreements entered into indicate that the conflict issue had been raised with them, as each contains language asserting that the respective defendant is aware that the codefendant was being represented by the same attorney, was affirmatively choosing to be represented by him nonetheless, and was waiving any conflict claim.

(5/4/09 Justice Pickholz Decision at 7-8.)

Even without the waiver clauses, Justice Pickholz would have rejected their claim. According to Justice Pickholz, the court's failure to make a Gomberg inquiry did "not constitute a per se violation" of Schmid and Eber-Schmid's right to counsel. (5/4/09 Justice Pickholz Decision at 8.) "In order to prevail upon a claim that counsel had a conflict of interest arising out of concurrent multiple representation," Justice Pickholz ruled, Schmid and Eber-Schmid had to "establish that the conflict bore 'a substantial relation to the conduct of [their] defense.'" (Id.) Justice Pickholz dismissed the contention that the alleged conflict "'operated on'" Schmid and Eber-Schmid's representation:

> There was no significant possibility of a conflict here because defendants' defenses to the crime were wholly consistent with each other. Defendant Eber-Schmid argues that she did not steal from [TNY] because she was ultimately responsible for all of the

charges on the card.   Defendant Schmid contends that all of his charges were authorized by his wife.   Nowhere in the instant motion does . . . Eber-Schmid dispute his claim.   If she indeed authorized all of his charges, and as she argues, she was responsible for them, then all of defendant Schmid's charges also did not constitute thefts from [TNY].   There is also no inconsistency in defendants' joint claim that they repaid all of the charges that they made to the card.   Any repayment that either defendant made to [TNY] would have inured to the benefit of them both.   The claim that their attorney refused to investigate records of payments that they had made to [TNY] because of a conflict of interest is therefore meritless.

(5/4/09 Justice Pickholz Decision at 8-9, citation omitted.)

Finally, Justice Pickholz rejected Schmid and Eber-Schmid's contention that Sklover was ineffective for neglecting to advise them of the collateral consequences of their guilty pleas or for failing to investigate exculpatory documents.   (5/4/09 Justice Pickholz Decision at 9-10.)   Justice Pickholz found no evidence, other than Schmid and Eber-Schmid's own affidavits, that Sklover failed to inform them of the consequences their guilty pleas would have on the related civil litigation.   (5/4/09 Justice Pickholz Decision at 9.)   As with the other claims, the Sklover affidavit contradicted Schmid and Eber-Schmid's allegations and the Stand affidavit was conspicuously silent on the issue.   (Id.)   Analyzing the claim that Sklover failed to investigate exculpatory evidence, Justice Pickholz found that aside from their own affidavits, Schmid and Eber-Schmid's only supporting evidence consisted of "impenetrable" spreadsheets devoid of meaningful financial analysis.   (Id.)   Moreover, in view of Schmid and Eber-Schmid's "admissions in their plea agreements and plea allocutions," Justice Pickholz found "no reason to believe that [those] documents exonerate[d] them in fact."   (5/4/09 Justice Pickholz Decision at 9-10.)   Finally, even if the documents showed "that the $52,000 figure was not exact," Justice Pickholz did not believe they relieved Schmid and Eber-Schmid of

18

liability; "[t]he fact remained that [they] charged personal items on the card and evinced no intention of reimbursing [TNY] for them."  (5/4/09 Justice Pickholz Decision at 10.)

On August 3, 2009, the First Department denied leave to appeal.  (Ex. B: Certificate Denying Leave.)

**Schmid and Eber-Schmid's Federal Habeas Corpus Petitions**

Read liberally, Schmid and Eber-Schmid's habeas corpus petitions assert that:  (1) their guilty pleas were not voluntary because Sklover "threaten[ed] to withdraw as counsel at the plea allocution if Petitioner[s] did not agree to plead guilty" (Dkt. No 1: Pet. ¶ 12(4); Dkt. No. 2: Pet. Br. at 22-23), and (2) they were denied the effective assistance of counsel in violation of their Sixth and Fourteenth Amendment rights because:  (a) they were not "adequately apprised of the potential for a conflict of interest" resulting from multiple concurrent representation because "the [trial] court never made the constitutionally required on-the-record inquiry despite the fact that [they were] jointly represented . . . in a single criminal action" (Pet. ¶ 12(1); Pet. Br. at 12-17; Dkt. No. 12: Pet. Traverse at 4-8); (b) Sklover's conflict of interest "adversely affected" his performance (Pet. Br. at 4-6; Pet. Traverse at 4-6); (c) Sklover failed  "to investigate documentary evidence that was available prior to [their] guily plea[s] which would have exculpated" them (Pet. ¶ 12(2)); Pet. Br. at 18-20; Pet. Traverse at 8-9); and (d) Sklover "affirmatively misled Petitioner[s] and induced Petitioner[s] to plead guilty telling Petitioner[s] that a guilty plea and payment of restitution in the criminal case would take restitution 'off the table' in the collateral civil case, while failing to mention the devastating collateral

H:\OPIN\EBER-SCHMID

consequence of the guilty plea with regard to [their] liability in the civil matter" (Pet. ¶ 12(3); Pet. Br. at 20-22).[4]

## ANALYSIS[5]

### I. THE AEDPA REVIEW STANDARD

Before the Court can determine whether petitioners are entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

---

[4] Amusingly, while complaining of the joint representation in state court, Schmid and Eber-Schmid ar jointly represented by counsel in connection with their habeas petitions. In response to this Court's inquiry (Dkt. No. 6: 10/28/09 Order), petitioners and their present counsel submitted affidavits and a brief stating that they do not believe there is any conflict but that even if there is, they are waiving it. (See Dkt. No. 7: 11/4/09 Pet. Supp. Br.; Dkt. No. 8: 11/4/09 Ray, 10/29/09 Schmid & 11/4/09 Eber-Schmid Affs.)

[5] The parties dispute whether a sentence of conditional discharge satisfies the "in custody" requirement of 28 U.S.C. § 2254(a). (Compare Dkt. No. 11: State Br. at 18-21; with Pet. Traverse at 2-4.) Because the Court recommends dismissing petitioners' habeas petition on other grounds, it need not decide the issue.

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[6/]

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." Williams v. Taylor, 529 U.S. at 404-05, 120 S. Ct. at 1519.[7/] Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." Williams v. Taylor, 529 U.S. at 412, 120 S. Ct. at 1523.[8/] "That federal law, as defined by the Supreme Court,

---

[6/]   See also, e.g., Knowles v. Mirzayance, 129 S. Ct. 1411, 1418 (2009); Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004); Dallio v. Spitzer, 343 F.3d 553, 559-60 (2d Cir. 2003), cert. denied, 541 U.S. 961, 124 S. Ct. 1713 (2004); Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'") (quoting Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001), cert. denied, 535 U.S. 1019, 122 S. Ct. 1611 (2002)).

[7/]   Accord, e.g., Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir.), cert. denied, 540 U.S. 1091, 124 S. Ct. 962 (2003); Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000); Lurie v. Wittner, 228 F.3d 113, 125 (2d Cir. 2000), cert. denied, 532 U.S. 943, 121 S. Ct. 1404 (2001); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000), cert. denied, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[8/]   Accord, e.g., Georgison v. Donelli, 588 F.3d 145, 153-54 (2d Cir. 2009); Dunlap v. Burge, 583 F.3d 160, 164 (2d Cir.), cert. denied, 130 S. Ct. 642 (2009); Carey v. Musladin, 549 U.S. 70, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from the Court regarding this [issue], it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); Yarborough v. Alvarado, 541 U.S. 652, 659, 124 S. Ct. 2140, 2147 (2004)
(continued...)

H:\OPIN\EBER-SCHMID

may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh v. Miller, 289 F.3d at 42; accord, e.g., Davis v. Grant, 532 F.3d 132, 140 (2d Cir. 2008), cert. denied,  129 S. Ct. 1312, 2009 WL 425166 at *1 (Feb. 23, 2009).  "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 341 F.3d at 110; accord, e.g., DelValle v. Armstrong, 306 F.3d at 1200.

> As to the "contrary to" clause:

> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . .  A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court]  precedent.

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[9/]

---

[8/]    (...continued)
("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); Wiggins v. Smith, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); Lockyer v. Andrade, 538 U.S. 63, 72, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the] Supreme] Court's decisions as of the time of the relevant state-court decision.'"); Hargett v. Giambruno, 291 Fed. Appx. 402, 403 (2d Cir. 2008); Howard v. Walker, 406 F.3d at 122; Tueros v. Greiner, 343 F.3d 587, 591 (2d Cir. 2003), cert. denied, 541 U.S. 1047, 124 S. Ct. 2171 (2004); Parsad v. Greiner, 337 F.3d at 181; DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002); Yung v. Walker, 341 F.3d 104, 109-110 (2d Cir. 2003); Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.), cert. denied, 537 U.S. 909, 123 S. Ct. 251 (2002); Loliscio v. Goord, 263 F.3d 178, 184 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 309 (2d Cir. 2001).

[9/]    Accord, e.g., Knowles v. Mirzayance, 129 S. Ct. at 1419 (The Supreme "Court has held on
(continued...)

H:\OPIN\EBER-SCHMID

In <u>Williams</u>, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 413, 120 S. Ct. at 1523.[10/] However, "[t]he term 'unreasonable' is . . . difficult to define." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 410, 120 S. Ct. at 1522.  The Supreme Court made clear that "an <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law." <u>Id.</u>[11/]  Rather, the issue is "whether the state court's application

---

[9/]     (...continued)
numerous occasions that it is not 'an unreasonable application of clearly established federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this [Supreme] Court.") (quotation omitted); <u>Brown</u> v. <u>Payton</u>, 544 U.S. 133, 125 S. Ct. 1432, 1438-39 (2005); <u>Bell</u> v. <u>Cone</u>, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005); <u>Price</u> v. <u>Vincent</u>, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); <u>Lockyer</u> v. <u>Andrade</u>, 123 S. Ct. at 1173-74; <u>Ortiz</u> v. <u>N.Y.S. Parole in Bronx, N.Y.</u>, 586 F.3d 149, 156 (2d Cir. 2009); <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 164; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d 238, 242 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1215, 127 S. Ct. 1267 (2007); <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d 210, 219 (2d Cir.), <u>cert. denied</u>, 546 U.S. 889, 126 S. Ct. 215 (2005); <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d at 591; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200; <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 109; <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d at 42; <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d at 184; <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d at 127-28.

[10/]    <u>Accord</u>, <u>e.g.</u>, <u>Wadddington</u> v. <u>Sarausad</u>, 129 S. Ct. 823, 831 (2009); <u>Brown</u> v. <u>Payton</u>, 544 U.S. at 141, 125 S. Ct. at 1439; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2534-35; <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d 80, 87 (2d Cir.), <u>cert. denied</u>, 130 S. Ct. 739 (2009); <u>Jones</u> v. <u>West</u>, 555 F.3d 90, 96 (2d Cir. 2009); <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1257, 127 S. Ct. 1383 (2007); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181.

[11/]    <u>See also</u>, <u>e.g.</u>, <u>Wadddington</u> v. <u>Sarausad</u>, 129 S. Ct. at 831; <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2535; <u>Price</u>
(continued...)

of clearly established federal law was objectively unreasonable." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 409, 120 S. Ct. at 1521.[12/] "Objectively unreasonable" is different from "clear error." <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."). This is a "substantially higher threshold" than incorrectness. <u>Knowles</u> v. <u>Mirzayance</u>, 129 S. Ct. at 1420.[13/] "[T]he range of

---

[11/]    (...continued)
v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ simply because that court concludes that the state-court decision applied [a Supreme Court case] incorrectly.'") (quoting <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (2002)); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175; <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 165-66 (A "federal court might agree with a petitioner that the relevant federal law should have been interpreted differently than the way it was interpreted by the state court yet still conclude that the state court's application of federal law was not unreasonable."); <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d at 87-88; <u>Jones</u> v. <u>West</u>, 555 F.3d at 96; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 219; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 124-25; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

[12/]    <u>Accord</u>, <u>e.g.</u>, <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520-21, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853; <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1174-75; <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. at 25-27, 123 S. Ct. at 360-61; <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 165; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d 515, 519 (2d Cir. 2006), <u>cert. denied</u>, 128 S. Ct. 75 (2007); <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 125; <u>Ryan</u> v. <u>Miller</u>, 303 F.3d 231, 245 (2d Cir. 2002); <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d at 184; <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d at 128-29.

[13/]    However, the Second Circuit has explained "that while '[s]ome increment of incorrectness
(continued...)

reasonable judgment can depend in part on the nature of the relevant rule." Yarborough v. Alvarado, 541 U.S. at 663, 124 S. Ct. at 2149.[14] "Even if the state court issues a decision 'contrary to' clearly established Supreme Court law, . . . a petitioner 'cannot obtain relief . . . unless application of a *correct* interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated.'"  Cousin v. Bennett, 511 F.3d 334, 339 (2d Cir.), cert. denied, 128 S. Ct. 2910 (2008).

---

[13]    (...continued)
        beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" Jones v. Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).; accord, e.g., Brisco v. Ercole, 565 F.3d at 88; Jones v. West, 555 F.3d at 96; Brown v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008) ("[W]e have observed that the "unreasonable application 'standard falls somewhere between merely erroneous and unreasonable to all reasonable jurists.'"); Davis v. Grant, 532 F.3d at 140; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at 197, 200-01; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d at 245; Yung v. Walker, 341 F.3d at 110; Loliscio v. Goord, 263 F.3d at 184.

[14]    The Supreme Court explained:

        [T]he range of reasonable judgment can depend in part on the nature of the relevant rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect.  Other rules are more general, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

        Yarborough v. Alvarado, 541 U.S. at 663, 124 S. Ct. at 2149; accord, e.g., Knowles v. Mirzayance, 129 S. Ct. at 1426 (Where the Supreme Court "standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."); Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d at 157; Dunlap v. Burge, 583 F.3d at 166; Hawkins v. Costello, 460 F.3d at 243.

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." Kennaugh v. Miller, 289 F.3d at 45.[15/]

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Mosby v. Senkowski, 470 F.3d at 519. "[I]t is the petitioner's burden to demonstrate that the state court applied the relevant clearly established law to the record in an unreasonable manner." Acosta v. Artuz, 575 F.3d 177, 184 (2d Cir. 2009); accord, e.g., Georgison v. Donelli, 588 F.3d at 154.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the

---

[15/]    Accord, e.g., Davis v. Grant, 532 F.3d at 140-41; Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; see Yarborough v. Alvarado, 541 U.S. at 665-66, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply it to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision.   There is force to this argument.   Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.  At the same time, the difference between applying a rule and extending it is not always clear.  Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") (citations omitted).

state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

<u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d at 312; <u>accord</u>, <u>e.g.</u>, <u>Bell</u> v. <u>Cone</u>, 543 U.S. at 455, 125 S. Ct. at 853 ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); <u>Early</u> v. <u>Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); <u>Wilson</u> v. <u>Mazzuca</u>, 570 F.3d 490, 499 (2d Cir. 2009) ("Where, as here, 'a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court precedent.'")[16] Even if the federal court holds an evidentiary hearing, the deferential AEDPA review standard applies.  <u>Wilson</u> v. <u>Mazzuca</u>, 570 F.3d at 501-02 ("Where . . . a district court has performed additional fact finding, the court must then ask whether the state court's decision 'was contrary to, or

---

[16]       <u>See also</u>, <u>e.g.</u>, <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d at 519; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 220; <u>Wade</u> v. <u>Herbert</u>, 391 F.3d 135, 140 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'"  "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference specified by § 2254."  Moreover, "if any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); <u>Francolino</u> v. <u>Kuhlman</u>, 365 F.3d 137, 141 (2d Cir.) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies.), <u>cert. denied</u>, 543 U.S. 872, 125 S. Ct. 110 (2004); <u>Jenkins</u> v. <u>Artuz</u>, 294 F.3d 284, 291 (2d Cir. 2002) ("In <u>Sellan</u>, we found that an even more concise Appellate Division disposition – the word 'denied' – triggered AEDPA deference.").

involved an unreasonable application of, clearly established Federal law,' . . . in light of any newly-discovered facts. . . . [W]e are directed to apply the same AEDPA standard that would otherwise be in force, now in light of the new information that has been obtained through a § 2254(e) hearing.").

Where the state court decision is not clear as to whether it rests on federal law or state procedural law, the Second Circuit in Jimenez v. Walker, 458 F.3d 130, 145-46 (2d Cir. 2006), cert. denied, 549 U.S. 1133, 127 S. Ct. 976 (2007), instructed that the court must "examine the three clues laid out in Coleman, Quirama and Sellan" – that is, "(1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances." Jimenez v. Walker, 458 F.3d at 145 & n.16; accord, e.g., Clark v. Perez, 510 F.3d 382, 394 (2d Cir.), cert. denied, 129 S. Ct. 130 (2008).  Using these three factors, the court should classify the decision as either:

> (1)    fairly appearing to rest primarily on federal law or to be interwoven with federal law or
>
> (2)    fairly appearing to rest primarily on state procedural law.

Absent a clear and express statement of reliance on a state procedural bar, the Harris presumption applies to decisions in the first category and deems them to rest on the merits of the federal claim.  Such decisions are not procedurally barred and must be afforded AEDPA deference as adjudications "on the merits" under 28 U.S.C. § 2254(d).  The Harris presumption does not apply to decisions in the second category, which show themselves to rest on an independent state procedural bar.  Nor does it apply to decisions in the first category which contain a clear statement of reliance on a state procedural bar.  No AEDPA deference is due to these decisions, but the state may successfully assert that habeas relief is foreclosed provided that the independent state procedural bar is adequate to support the judgment and that neither cause and prejudice nor a fundamental miscarriage of justice is shown.

The effect of these rules is to present federal habeas courts with a binary circumstance:  we either apply AEDPA deference to review a state court's disposition

> of a federal claim or refuse to review the claim because of a procedural bar properly raised.  The middle ground . . . does not exist.

Jimenez v. Walker, 458 F.3d at 145-46 (citations & fns. omitted); accord, e.g., Hawkins v. Costello, 460 F.3d at 242 ("In Jimenez v. Walker, we recently made clear that when a state court rejects a petitioner's claim as either unpreserved or without merit, the conclusive presumption is that the adjudication rested on the merits.").  Of course, "[i]f there is no [state court] adjudication on the merits [and no procedural bar], then the pre-AEDPA, de novo standard of review applies."  Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003); see also Wilson v. Mazzuca, 570 F.3d at 500 n.8; Jimenez v. Walker, 458 F.3d at 145 n.17.

Finally, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless."  Howard v. Walker, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations:  "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1); accord, e.g., Lynn v. Bliden, 443 F.3d at 246-47; Rosa v. McCray, 396 F.3d at 220.  "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'"  Parsad v. Greiner, 337 F.3d at 181 (quoting § 2254(e)(1)); accord, e.g., Brown v. Alexander, 543 F.3d at 100; Lynn v. Bliden, 443 F.3d at 246-47.

## II.   SCHMID AND EBER-SCHMID'S INVOLUNTARY PLEA CLAIMS SHOULD BE DENIED

### A.   Legal Principles Governing Guilty Pleas

Constitutional due process requires that a guilty plea be voluntary, knowing, and intelligent.  E.g., Bradshaw v. Stumpf, 545 U.S. 175, 183, 125 S. Ct. 2398, 2405 (2005); United States v. Ruiz, 536 U.S. 622, 629, 122 S. Ct. 2450, 2455 (2002); Bousley v. United States, 523 U.S. 614, 618, 118 S. Ct. 1604, 1609 (1998); Mabry v. Johnson, 467 U.S. 504, 508, 104 S. Ct. 2543, 2546-47 (1984); Brady v. United States, 397 U.S. 742, 748, 90 S. Ct. 1463, 1469 (1970); Boykin v. Alabama, 395 U.S. 238, 242-43 & n.5, 89 S. Ct. 1709, 1711-12 & n.5 (1969).[17/]

"The standard for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'"  Urena v. People of the State of New York, 160 F. Supp. 2d 606, 610 (S.D.N.Y. 2001) (Weinstein, D.J.) (quoting Ventura v. Meachum, 957 F.2d 1048, 1058 (2d Cir. 1992)).  A plea is involuntary where the defendant did not have "'knowledge of the nature of the constitutional protections he will forgo by entering his plea.'"  Marcelin v. Garvin, 97 Civ. 2996, 1999 WL 977221 at *5 (S.D.N.Y. Oct. 26, 1999) (Peck, M.J.) (quoting Matusiak v. Kelly, 786 F.2d 536, 543 (2d Cir.), cert. denied, 479 U.S. 805, 107 S. Ct. 248 (1986)).  "A plea is 'intelligent' and 'voluntary' when a defendant had the advice of counsel, understood the consequences of his plea and the plea was not

---

[17/]   See also, e.g., United States v. Adams, 448 F.3d 492, 497-98 (2d Cir. 2006); Hanson v. Phillips, 442 F.3d 789, 798 (2d Cir. 2006); Wilson v. McGinnis, 413 F.3d 196, 198-99 (2d Cir. 2005); Innes v. Dalsheim, 864 F.2d 974, 977 (2d Cir. 1988), cert. denied, 493 U.S. 809, 110 S. Ct. 50 (1989).

physically or mentally coerced." <u>Heron</u> v. <u>People</u>, 98 Civ. 7941, 1999 WL 1125059 at *5 (S.D.N.Y. Dec. 8, 1999); <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Doe</u>, 537 F.3d 204, 211 (2d Cir. 2008) ("[T]he Supreme Court has instructed that, with regard to voluntariness, a guilty plea 'must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).'"); <u>Miller</u> v. <u>Angliker</u>, 848 F.2d 1312, 1320 (2d Cir.) ("[A] plea is deemed 'intelligent' if the accused had the advice of counsel and understood the consequences of his plea, even if only in a fairly rudimentary way; it is deemed 'voluntary' if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally."), <u>cert. denied</u>, 488 U.S. 890, 109 S. Ct. 224 (1988).[18/]

---

[18/]    <u>See also</u>, <u>e.g.</u>, <u>White</u> v. <u>Walker</u>, No. 01-CV-0238, 2007 WL 169702 at *11 (N.D.N.Y. Jan. 18, 2007) (quoting <u>Heron</u>); <u>Jones</u> v. <u>Perlman</u>, 05 Civ. 5338, 2006 WL 490055 at *1 (S.D.N.Y. Feb. 28, 2006) (Lynch, D.J.) ("The Supreme Court has held that a guilty plea is intelligent and voluntary when the defendant had the advice of counsel, understood the consequences of the plea, and was not physically or mentally coerced."); <u>Bastien</u> v. <u>William</u>, 03 Civ. 5749, 2004 WL 2978283 at *4 (S.D.N.Y. Dec. 20, 2004); <u>France</u> v. <u>Strack</u>, No. 99-CV-2510, 2001 WL 135744 at *3 (E.D.N.Y. Jan. 30, 2001) ("Pleading guilty to avoid a more severe sentence does not in itself qualify as involuntary because the plea can nonetheless be the 'product of a free and rational choice, especially where the defendant was represented by competent counsel whose advice was that the plea would be to the defendant's advantage.'"); <u>Ramirez</u> v. <u>Headley</u>, 98 Civ. 2603, 1998 WL 788782 at *5 (S.D.N.Y. Nov. 10, 1998); <u>Martuzas</u> v. <u>Reynolds</u>, 983 F. Supp. 87, 94 (N.D.N.Y. 1997) (Pooler, D.J.); <u>Phan</u> v. <u>McCoy</u>, No. 94-CV-1596, 1997 WL 570690 at *6 (N.D.N.Y. Aug. 28, 1997) (Pooler, D.J.) ("The mere fact that a defendant pleaded guilty solely to limit his possible penalty does not make that plea involuntary."); <u>United States</u> v. <u>Millan-Colon</u>, 829 F. Supp. 620, 635 (S.D.N.Y. 1993), <u>aff'd</u>, 17 F.3d 14 (2d Cir. 1994).

A "'plea of guilty entered by one fully aware of the direct consequences' of the plea is voluntary in a constitutional sense 'unless induced by threats, misrepresentations, or perhaps by promises that are by their nature improper.'" Bousley v. United States, 523 U.S. at 619, 118 S. Ct. at 1609 (ellipses omitted) (quoting Brady v. United States, 397 U.S. at 744, 90 S. Ct. at 1472)).[19]

"'It is well settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked.'" Bousley v. United States, 523 U.S. at 621, 118 S. Ct. at 1610 (quoting Mabry v. Johnson, 467 U.S. at 508, 104 S. Ct. at 2547-47); accord, e.g., Bradshaw v. Stumpf, 545 U.S. at 186, 125 S. Ct. at 2407.[20]

"As the Supreme Court has noted, statements made at plea allocutions carry a strong presumption of verity and constitute a formidable barrier in any subsequent collateral proceeding." Marcelin v. Garvin, 1999 WL 977221 at *7 (quotations omitted, quoting, inter alia, Blackledge v. Allison, 431 U.S. 63, 74, 97 S. Ct. 1621, 1629 (1977)); accord, e.g., United States v. Grzybek, 283

---

[19]    Accord, e.g., Mabry v. Johnson, 467 U.S. at 509, 104 S. Ct. at 2547; United States v. Doe, 537 F.3d at 211; McMahon v. Hodges, 382 F.3d 284, 290 (2d Cir. 2004); United States v. Rossillo, 853 F.2d 1062, 1064 (2d Cir. 1988); Gervais v. United States, No. 08-CV-22, 2008 WL 1994944 at *5 (E.D.N.Y. May 5, 2008) (Weinstein, D.J.); Davila v. United States, No. 07-CV-1320, 2008 WL 906691 at *11 (E.D.N.Y. Mar. 31, 2008) (Weinstein, D.J.); King v. Cunningham, 442 F. Supp. 2d 171, 183 (S.D.N.Y. 2006); Smith v. Burge, 03 Civ.8648, 2005 WL 78583 at *13 (S.D.N.Y. Jan. 12, 2005); Marcelin v. Garvin, 1999 WL 977221 at *5; Smylis v. City of New York, 25 F. Supp. 2d 461, 465 (S.D.N.Y. 1998); see also, e.g., Willbright v. Smith, 745 F.2d 779, 780-81 (2d Cir. 1984).

[20]    See, e.g., Isaza v. United States, 04 Civ. 6096, 2008 WL 1849170 at *3 (S.D.N.Y. Apr. 24, 2008); Groppi v. United States, 05 Civ. 7058, 2006 WL 416393 at *3 (S.D.N.Y. Feb. 17, 2006); Grullon v. United States, 98 Cr. 524, 04 Civ. 5766, 2006 WL 20498 at *1 (S.D.N.Y. Jan. 4, 2006); Marcelin v. Garvin, 1999 WL 977221 at *6.

Fed. Appx. 843, 845 (2d Cir. 2008) ("It is well established that '[a] criminal defendant's self-inculpatory statements made under oath at this plea allocution carry a strong presumption of verity . . . and are generally treated as conclusive in the face of the defendant's later attempt to contradict them.'"); United States v. Laano, 58 Fed. Appx. 859, 861 (2d Cir. 2003) ("A defendant who offers a claim of innocence to substantiate altering his plea must overcome 'the strong presumption of verity that attaches to his admissions of guilt at his plea allocution.'").[21]

**B.** **Application of this Standard to Schmid and Eber-Schmid's Claim**

Schmid and Eber-Schmid claim that they are entitled to habeas relief because their guilty pleas were involuntary; they allege that Sklover coerced their guilty pleas when he "threaten[ed] to withdraw as counsel . . . if Petitioner[s] did not agree to plead guilty." (See pages 2 & 18 above.) According to petitioners, this threat so overwhelmed them that they agreed to plead guilty even though they were innocent. (See page 11 above.)

In denying Schmid and Eber-Schmid's C.P.L. § 440 motion, Justice Pickholz held that:

---

[21]     See, e.g., Adames v. United States, 171 F.3d 728, 732-33 (2d Cir. 1999) (statements at plea allocution "'carry a strong presumption of verity' . . . and are generally treated as conclusive in the face of the defendant's later attempt to contradict them," citing cases); United States v. Paredes-Acevedo, 04 Cr. 363, 2008 WL 2743208 at *2 (S.D.N.Y. June 23, 2008) ("The defendant's 'statements . . . under oath at his plea allocution carry a "strong presumption of verity," . . . .'"); United States v. Caesar, 94 Cr. 59, 1995 WL 312443 at *3 (S.D.N.Y. May 23, 1995) ("The Court notes that statements made during a plea allocution carry a strong presumption of verity. Such statements are conclusive absent credible reason justifying departure from their apparent truth.") (citations & internal quotation marks omitted); United States v. Napolitano, 212 F. Supp. 743, 747 (S.D.N.Y. 1963) (Weinfeld, D.J.) ("The defendant's admissions . . . [at guilty plea] are solemn declarations; they are not to be lightly disregarded in favor of his present self-serving assertion . . .").

> [Schmid and Eber-Schmid's] claim that Mr. Sklover told them that he would withdraw as their attorney if they did not plead guilty is belied by their denials at the time of their pleas that they had been threatened or coerced to plead guilty. Furthermore, they had ample opportunity to complain of any pressure prior to or at the time of sentence, but did not do so. . . . There was good reason for them to accept the plea offer. As they conceded in the plea waivers that they signed, they were obtaining a favorable disposition. Although their pleas removed the issue of liability from their civil case, they were spared the possibility of going to jail. Further, . . . [t]he promised sentence - a three-year conditional discharge and restitution - was extremely lenient. If Mr. Sklover indeed told them that they would might [sic] well go to jail if they did not plead guilty, his advice was sound and did not constitute coercion.

(See page 15 above.)

As Justice Pickholz correctly noted, Schmid and Eber-Schmid's plea allocutions contradict their current claim of coercion: At their guilty plea allocutions, Schmid and Eber-Schmid affirmed that they wished to plead guilty to fourth degree larceny in exchange for sentences of conditional discharge. (See pages 5-7 above.) Schmid and Eber-Schmid also affirmed that they understood the rights they were giving up by pleading guilty, including the right to a jury trial and the right to tell their side of the story. (See pages 5-6 above.) Significantly, when Justice Pickohlz's asked whether they were both "pleading guilty because [they] are guilty and for no other reason?" Schmid and Eber-Schmid replied in the affirmative. (See page 6 above.) When asked whether anyone had "forced or threatened" them to plead guilty they both answered "No." (See page 6 above.) Justice Pickholz explained the plea agreement to them, and Schmid and Eber-Schmid affirmed their understanding of the promised sentence. (See page 6 above.) Schmid and Eber-Schmid denied that any other promises had been made to them in exchange for their guilty plea. (See page 6 above.) Finally, Schmid and Eber-Schmid admitted to the facts of the charged crime, i.e., that they stole

$52,163.96 by using TNY's "credit cards to make personal purchases that were totally unauthorized by TNY's board of directors and unrelated to TNY's business."  (See page 7 above.)  At no time during their guilty plea allocution, or during their subsequent sentencing, did Schmid or Eber-Schmid complain to Justice Pickholz of the alleged coercion or otherwise express dissatisfaction with their decision to plead guilty.

Other than their own self-serving affidavits, Schmid and Eber-Schmid have presented no evidence that their pleas were improperly coerced, or otherwise involuntary.  Unsubstantiated protestations of coercion are not a basis for withdrawing a knowing and voluntary guilty plea.  See, e.g., Rosenberger v. United States, 133 Fed. Appx. 799, 801 (2d Cir. 2005) (Defendant "has set forth no evidence, other than his self-serving, conclusory allegations, that he was coerced into pleading guilty.  Moreover, the plea allocution indicates that [defendant's] guilty plea . . . was knowing and voluntary."); United States v. Davis, 48 Fed. Appx. 809, 811-12 (2d Cir. 2002) ("During his plea allocution, [defendant] admitted his guilt under oath and in his own words, and stated that his plea was free and voluntary, that no threats or untoward promises had been made to induce his plea, and that he was satisfied with the advice of counsel. . . . Although since his guilty plea [defendant] has consistently protested his innocence of the charges [and claims his counsel coerced him to plead guilty], a claim of innocence [and coercion by counsel] is not a basis for withdrawing a guilty plea unless supported by evidence."); United States v. Bonilla, 17 Fed. Appx. 11, 13 (2d Cir. 2000) ("This Circuit has consistently affirmed denials of motions to withdraw guilty pleas when the defendant's allegations are 'directly contradicted by his clear statements at allocution' that contained sufficient

factual detail about the offense."); <u>May</u> v. <u>Donelli</u>, 615 F. Supp. 2d 88, 94 (W.D.N.Y. 2009) ("Conclusory denials of guilt such as those made by [petitioner] at sentencing are entitled to little weight by the reviewing court."); <u>McCants</u> v. <u>McCoy</u>, No. 00-CV-6444, 2008 WL 4852681 at *5 (W.D.N.Y. Nov. 6, 2008) ("Where a defendant 'has explicitly stated in his allocution that he fully understands the consequences of his plea and that he has chosen to plead guilty after a thorough consultation with his attorney, a district court on habeas review may rely on the defendant's sworn statements and hold him to them.'")(citations omitted).[22]

   The favorable sentences Schmid and Eber-Schmid received in exchange for their guilty pleas – conditional discharges (<u>see</u> pages 7-8 above) – underscore the voluntariness and validity of their pleas.  <u>See, e.g.</u>, <u>Donaldson</u> v. <u>Lape</u>, No. 06 CV 0727, 2010 WL 301914 at *7 (W.D.N.Y.

---

[22] <u>See also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Torres</u>, 129 F.3d 710, 715 (2d Cir. 1997); <u>United States</u> v. <u>Gonzalez</u>, 970 F.2d 1095, 1100-01 (2d Cir. 1992); <u>Baker</u> v. <u>Murray</u>, 460 F. Supp. 2d 425, 433 (W.D.N.Y. 2006) ("Furthermore, petitioner has not provided credible evidence that would justify overlooking his statements under oath that he was choosing to plead guilty of his own accord.  In the context of a plea allocution, a defendant's '[s]olemn declarations in open court carry a strong presumption of verity.'"); <u>Gomez</u> v. <u>Duncan</u>, 02 Civ. 0846, 2004 WL 119360 at *19 (S.D.N.Y. Jan. 27, 2004) (Peck, M.J.) ("This Court may credit [petitioner's] statements at the plea allocution – that his guilty plea was voluntary and not the result of any threats or promises – over his later allegations of coercion.") (record cites omitted; citing cases), <u>aff'd</u>, 317 Fed. Appx. 79 (2d Cir. 2009); <u>Urena</u> v. <u>New York</u>, 160 F. Supp. 2d 606, 611 (S.D.N.Y. 2001) (Petitioner "stated on the record that he knew that he was giving up the right to trial and the safeguards that accompany that right, that he was not threatened or forced to plead guilty, and that he sold over two ounces of cocaine to an undercover officer.  These statements undermine petitioner's claim that his plea was involuntary . . . .") (citing cases); <u>France</u> v. <u>Strack</u>, No. 99-CV-2510, 2001 WL 135744 at *4 (E.D.N.Y. Jan. 30, 2001) ("Where a petitioner's claims of mistake and coercion find no support in the record and are contradicted by the statements made under oath at the plea proceeding, they do not entitle him to relief.").

Jan. 19, 2010) ("Where, as here, 'a petitioner secured a significant strategic benefit by pleading guilty, courts [in this Circuit] are generally less likely to suspect an involuntary or misguided decision to plead.'"); United States v. Diaz, No. 07 Cr. 003, 2009 WL 4496052 at *4 (S.D.N.Y. Dec. 3, 2009) ("[W]hen the record as a whole is evaluated, it does not support [defendant]'s contention that there is a reasonable possibility that, had he been correctly informed of his possible sentencing outcomes, he would have elected to proceed to trial instead of pleading guilty.") (Jones, D.J.); Garner v. Superintendent of Upstate Corr. Facility, No. 01-CV-0501, 2007 WL 2846907 at *8 (N.D.N.Y. Sept. 26, 2007) ("[W]here a defendant obtains a meaningful strategic benefit by pleading guilty, most courts consider it unlikely that an involuntary or ill-advised plea ensued.").[23]

Schmid and Eber-Schmid's pleas were the culmination of several months of negotiations with the DA's Office.  (See pages 12-14 above.)  Petitioners were represented by counsel throughout the negotiations and were shown documentary evidence of their guilt.  (See page 13 above.)  ADA Kale made clear that he was prepared to seek indictment if they continued to dispute their criminal liability, and Schmid and Eber-Schmid understood that if they proceeded to trial they faced a considerable possibility of incarceration.  (See pages 13-15 above.)  In light of the evidence against them – evidence their own counsel seems to have found fairly damning (see pages 12-15 above) – and considering that Schmid and Eber-Schmid's primary interest was to avoid incarceration

---

[23]    Accord, e.g., Barnes v. Ercole, 09 Civ. 2530, 2009 WL 2370814 at *11 (S.D.N.Y. Aug. 3, 2009) (Peck, M.J.); Scott v. Superintendant, Mid-Orange Corr. Facility, No. 03-CV-6383, 2006 WL 3095760 at *9 (E.D.N.Y. Oct. 31, 2006); Padilla v. Keane, 331 F. Supp. 2d 209, 217 (S.D.N.Y. 2004).

(see pages 14-15 above), accepting the plea agreements was in their best interest.  Indeed, Schmid and Eber-Schmid themselves acknowledged, when waiving the right to appeal their convictions, that they received "favorable plea and sentence agreement[s]."  (See pages 7-8 above.)

   In any event, the Court cannot say that Justice Pickholz's decision was contrary to, or an unreasonable application of, clearly established federal law as defined by the Supreme Court. Accordingly, Schmid and Eber-Schmid's involuntary plea claims should be <u>DENIED</u>.

## III. SCHMID AND EBER-SCHMID'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS SHOULD BE DENIED

### A. The Strickland v. Washington Standard on Ineffective Assistance of Counsel

   In Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective:  "First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id. at 687, 104 S. Ct. at 2064.[24]  This performance is to be judged by an objective standard of reasonableness.  Strickland v. Washington, 466 U.S. at 688, 104 S. Ct. at 2064.[25]

   Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction . . . .

---

[24] Accord, e.g., Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003); Bell v. Miller, 500 F.3d 149, 156-57 (2d Cir. 2007); Henry v. Poole, 409 F.3d 48, 62-63 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006).

[25] Accord, e.g., Wiggins v. Smith, 539 U.S. at 521, 123 S. Ct. at 2535; Bell v. Cone, 535 U.S. 685, 695, 122 S. Ct. 1843, 1850 (2002); Rosario v. Ercole, No. 08-5521, — F.3d —, 2010 WL 1427507 at *3 (2d Cir. Apr. 12, 2010); Henry v. Poole, 409 F.3d at 63.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time . . . .  [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Strickland v. Washington, 466 U.S. at 689, 104 S. Ct. at 2065 (citation omitted).[26/]

Second, the defendant must show prejudice from counsel's performance.  Strickland v. Washington, 466 U.S. at 687, 104 S. Ct. at 2064.  The "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." Id. at 695, 104 S. Ct. at 2068-69.  Put another way, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694, 104 S. Ct. at 2068.[27/]

---

[26/]    Accord, e.g., Bell v. Cone, 535 U.S. at 698, 122 S. Ct. at 1852; Bell v. Miller, 500 F.3d at 156-57; Henry v. Poole, 409 F.3d at 63; Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001).

[27/]    See also, e.g., Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542; Bell v. Cone, 535 U.S. at 695, 122 S. Ct. at 1850; Rosario v. Ercole, 2010 WL 1427507 at *3; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 128 S. Ct. 75 (2007); Henry v. Poole, 409 F.3d at 63-64; Aparicio v. Artuz, 269 F.3d at 95; Sellan v. Kuhlman, 261 F.3d at 315; DeLuca v. Lord, 77 F.3d 578, 584 (2d Cir.), cert. denied, 519 U.S. 824, 117 S. Ct. 83 (1996).

"[A] reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068; accord, e.g., Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542; Rosario v. Ercole, 2010 WL 1427507 at *3.  The phrase "reasonable probability," despite its language, should not be confused with "probable" or "more likely than not."  Strickler v. Greene, 527 U.S. 263, 289-91, 119 S. Ct. 1936, 1952-53 (1999); Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66

(continued...)

The Supreme Court has counseled that these principles "do not establish mechanical rules." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 696, 104 S. Ct. at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. <u>Id</u>.

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.'" <u>Lindstadt</u> v. <u>Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001) (quoting <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 695-96, 104 S. Ct. at 2069); <u>accord</u>, <u>e.g.</u>, <u>Rodriguez</u> v. <u>Hoke</u>, 928 F.2d 534, 538 (2d Cir. 1991).

The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 697, 104 S. Ct. at 2069.[28]

_____

27/      (...continued)
(1995); <u>Nix</u> v. <u>Whiteside</u>, 475 U.S. 157, 175, 106 S. Ct. 988, 998 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under <u>Strickland</u>"); <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 694, 104 S. Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."). Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility." <u>Strickler</u> v. <u>Greene</u>, 527 U.S. at 291, 119 S. Ct. at 1953; <u>cf.</u> <u>id.</u> at 297-301, 119 S. Ct. at 1955-58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

28/      <u>Accord</u>, <u>e.g.</u>, <u>Smith</u> v. <u>Robbins</u>, 528 U.S. 259, 286 n.14, 120 S. Ct. 746, 764 n.14 (2000).

In addition, the Supreme Court has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . .   In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  Strickland v. Washington, 466 U.S. at 690-91, 104 S. Ct. at 2066.[29]

As the Second Circuit noted:  "The Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d at 199; accord, e.g., Bell v. Miller, 500 F.3d at 156-57.

---

[29]   See also, e.g., Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003); Engle v. Isaac, 456 U.S. 107, 134, 102 S. Ct. 1558, 1575 (1982) ("We have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998) ("In reviewing Strickland claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on . . . counsel a duty to raise every "colorable" claim' on appeal.") (citations omitted); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), cert. denied, 513 U.S. 820, 115 S. Ct. 81 (1994).

The <u>Strickland</u> standard also applies to ineffective assistance claims arising out of a guilty plea. <u>Hill</u> v. <u>Lockhart</u>, 474 U.S. 52, 58, 106 S. Ct. 366, 370 (1985).[30/]  "In the context of a guilty plea, the prejudice requirement 'focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" <u>Moore</u> v. <u>United States</u>, 00 Civ. 4560, 98 Cr. 833, 2001 WL 253432 at *11 (S.D.N.Y. Mar. 15, 2001) (Peck, M.J.) (quoting <u>Hill</u> v. <u>Lockhart</u>, 474 U.S. at 59, 106 S. Ct. at 370).[31/]

## B.    Ineffective Assistance and Conflicts of Interest

"'A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel.'" <u>United States</u> v. <u>Schwarz</u>, 283 F.3d 76, 90 (2d Cir. 2002) (quoting <u>United States</u> v. <u>Blau</u>, 159 F.3d 68, 74 (2d Cir. 1998)); <u>see</u>, <u>e.g.</u>, <u>Wood</u> v. <u>Georgia</u>,

---

[30/]    <u>See</u>, <u>e.g.</u>, <u>Wright</u> v. <u>Van Patten</u>, 552 U.S. 120, 128 S. Ct. 743, 746 (2008); <u>United States</u> v. <u>Doe</u>, 537 F.3d 204, 213-14 (2d Cir. 2008); <u>United States</u> v. <u>Jennings</u>, 282 Fed. Appx. 37, 38 (2d Cir. 2008); <u>United States</u> v. <u>Arteca</u>, 411 F.3d 315, 320 (2d Cir. 2005);  <u>United States</u> v. <u>Thomas</u>, 74 Fed. Appx. 113, 115 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 1019, 124 S. Ct. 2089 (2004).

[31/]    <u>Accord</u>, <u>e.g.</u>, <u>United States</u> v. <u>Doe</u>, 537 F.3d at 214; <u>United States</u> v. <u>Arteca</u>, 411 F.3d at 320; <u>United States</u> v. <u>Garcia</u>, 57 Fed. Appx. 486, 489 (2d Cir.), <u>cert. denied</u>, 538 U.S. 992, 123 S. Ct. 1815 (2003); <u>United States</u> v. <u>Couto</u>, 311 F.3d at 187; <u>United States</u> v. <u>Coffin</u>, 76 F.3d 494, 498 (2d Cir.), <u>cert. denied</u>, 517 U.S. 1147, 116 S. Ct. 1445 (1996); <u>Tate</u> v. <u>Wood</u>, 963 F.2d 20, 26 (2d Cir. 1992); <u>Ventura</u> v. <u>Meachum</u>, 957 F.2d 1048, 1058 (2d Cir.1992); <u>Panuccio</u> v. <u>Kelly</u>, 927 F.2d 106, 108 (2d Cir. 1991); <u>Heyward</u> v. <u>Costello</u>, 91 Civ. 1570, 1994 WL 263426 at *3-4 (S.D.N.Y. June 13, 1994); <u>People</u> v. <u>McDonald</u>, 1 N.Y.3d 109, 115, 769 N.Y.S.2d 781, 785 (2003).

450 U.S. 261, 271, 101 S. Ct. 1097, 1103 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."); Holloway v. Arkansas, 435 U.S. 475, 490, 98 S. Ct. 1173, 1181 (1978) ("The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters.").[32]

A defendant is denied the effective assistance of counsel, in violation of the Sixth Amendment, when his attorney has:  (1) a per se conflict; (2) an actual conflict that adversely affects the attorney's performance; or (3) a potential conflict that results in prejudice to the defendant.  E.g., Ventry v. United States, 539 F.3d at 111 (identifying "three particular kinds of counsel-client conflicts: per se conflicts, actual conflicts, and potential conflicts," and explaining when such conflict violate the Sixth Amendment).[33]

Per se conflicts occur in two situations:  "[1] where trial counsel is not authorized to practice law and [2] where trial counsel is implicated in the 'same or closely related criminal conduct' for which the defendant is on trial." United States v. Williams, 372 F.3d at 103; see also, e.g., United States v. John Doe No. 1, 272 F.3d at 125 ("[W]e have limited per se conflicts to two instances:

---

[32]    Accord, e.g., Ventry v. United States, 539 F.3d 102, 110 (2d Cir. 2008); Locascio v. United States, 395 F.3d 51, 56 (2d Cir. 2005), cert. denied, 552 U.S. 1010, 128 S. Ct. 554 (2007); United States v. Williams, 372 F.3d 96, 102 (2d Cir. 2004); United States v. Perez, 325 F.3d 115, 125 (2d Cir. 2003); United States v. Blount, 291 F.3d 201, 210 (2d Cir. 2002), cert. denied, 537 U.S. 1141, 123 S. Ct. 938 (2003).

[33]    Accord, e.g., United States v. Williams, 372 F.3d at 102-03; United States v. John Doe No. 1, 272 F.3d 116, 125 (2d Cir. 2001), cert. denied, 537 U.S. 851, 123 S. Ct. 204 (2002); Armienti v. United States, 234 F.3d 820, 823 (2d Cir. 2000).

(1) where trial counsel is not authorized to practice law or (2) where counsel is implicated in the crime for which the defendant is on trial."); Armienti v. United States, 234 F.3d at 823-24; United States v. Fulton, 5 F.3d 605, 611 (2d Cir. 1993) ("The per se rule applies when an attorney is implicated in the crimes of his or her client.").  Because they are so severe, per se conflicts are unwaivable and require "automatic reversal without a showing of prejudice."  United States v. John Doe No. 1, 272 F.3d at 125; see, e.g., Ventry v. United States, 539 F.3d at 111 (Per se conflicts "'are unwaivable and do not require a showing that the defendant was prejudiced by his representation.'"); United States v. Williams, 372 F.3d at 103.

There is an actual conflict between a lawyer and client "when, during the course of the representation, the attorney's and defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.'"[34]  Winkler v. Keane, 7 F.3d 304, 307 (2d Cir. 1993) (quoting Cuyler v. Sullivan, 446 U.S. 335, 356 n.3, 100 S. Ct. 1708, 1722 n.3 (1980) (Marshall, J., concurring

---

[34]    "The defendant's mere assertion, however, that his attorney is providing less than constitutionally effective assistance, which requires the attorney to defend his preparation and strategy, is not itself sufficient to create a divergence of the attorney's interests from those of the defendant."  United States v. Jones, 482 F.3d 60, 75 (2d Cir. 2006) (citation & internal quotations omitted) (Where defendant claimed that his attorneys had a conflict of interest because defendant disagreed with his attorneys "as to tactics," defendant "has not shown an actual conflict of interest.  Nor has [defendant] called to our attention any basis for finding that his attorneys had a potential conflict of interest."), cert. denied, 549 U.S. 1231, 127 S. Ct. 1306 (2007); see also, e.g., United States v. Berger, 188 F. Supp. 2d 307, 333-34 (S.D.N.Y. 2002) ("Because under Cuyler the defendant benefits from a presumption of the prejudice that he would otherwise have to affirmatively prove under Strickland, courts have noted the incentive for defendants to characterize ordinary ineffective assistance of counsel claims as conflict of interest claims. . . . The mere expression of a defendant's dissatisfaction with his counsel's performance or trial strategy is insufficient to establish that an actual conflict of interest exists.").

in part & dissenting in part)), cert. denied, 511 U.S. 1022, 114 S. Ct. 1407 (1994); see Mickens v.

Taylor, 535 U.S. 162, 172 n.5, 122 S. Ct. 1237, 1244 n.5 (2001) ("An 'actual conflict,' for Sixth

Amendment purposes, is a conflict of interest that adversely affects counsel's performance.")[35]

"Although a defendant is generally required to show prejudice to prevail on an ineffective assistance

of counsel claim," where a defendant demonstrates that an actual conflict of interest adversely

affected counsel's performance, prejudice is presumed.[36] Locascio v. United States, 395 F.3d at 56;

see, e.g., Mickens v. Taylor, 535 U.S. at 173, 122 S. Ct. at 1244 ("[P]rejudice will be presumed only

if the conflict has significantly affected counsel's performance – thereby rendering the verdict

unreliable, even though Strickland prejudice cannot be shown."); Burger v. Kemp, 483 U.S. 776, 783,

107 S. Ct. 3114, 3120 (1987) ("[W]e presume prejudice only if the defendant demonstrates that

counsel actively represented conflicting interests and that an actual conflict of interest adversely

affected his lawyer's performance.") (quotations omitted); Cuyler v. Sullivan, 446 U.S. at 349-50, 100

---

[35]     Accord, e.g., Ventry v. United States, 539 F.3d at 111; United States v. Jones, 482 F.3d at
         75; Locascio v. United States, 395 F.3d at 56; United States v. Williams, 372 F.3d at 102;
         United States v. Schwarz, 283 F.3d 76, 91 (2d Cir. 2002).

[36]     To date, the Supreme Court only has applied this presumption of prejudice to cases involving
         attorneys who concurrently represented clients with conflicting interests – so-called "multiple
         concurrent representation." Mickens v. Taylor, 535 U.S. at 175-76, 122 S. Ct. at 1245-46
         ("In resolving this case on the grounds on which it was presented to us, we do not rule upon
         the need for the Sullivan prophylaxis in cases of successive representation. Whether Sullivan
         should be extended to such cases remains, as far as the jurisprudence of this Court is
         concerned, an open question."). In such cases, the Supreme Court explained, a presumption
         of prejudice it justified by "the high probability of prejudice arising from multiple concurrent
         representation, and the difficulty of proving that prejudice." Mickens v. Taylor, 535 U.S. at
         175, 122 S. Ct. at 1245 (citations omitted). However, "[n]ot all attorney conflicts present
         comparable difficulties." Mickens v. Taylor, 535 U.S. at 175, 122 S. Ct. at 1245.

S. Ct. at 1719 (A "defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.").[37]

To demonstrate that an actual conflict adversely affected counsel's performance, a defendant must show that a "lapse in representation" resulted from the conflict.  Cuyler v. Sullivan, 446 U.S. at 349, 100 S.Ct. at 1720.[38]  In other words, the defendant must "'demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'"  Eisemann v. Herbert, 401 F.3d at 107.[39]  In this regard, a defendant need not show that the alternative defense "would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative."  Winkler v. Keane, 7 F.3d at 309.[40]

Potential conflicts exist where "the interests of the defendant may place the attorney under inconsistent duties at some time in the future." United States v. Kliti, 156 F.3d 150, 153 n.3 (2d Cir. 1998) (citing Cuyler v. Sullivan, 446 U.S. at 356 n.3, 100 S. Ct. at 1722 n.3); accord, e.g.,

---

[37]    See also, e.g., Ventry v. United States, 539 F.3d at 111; Eisemann v. Herbert, 401 F.3d 102, 107 (2d Cir. 2005); United States v. Williams, 372 F.3d at 106; United States v. Schwarz, 283 F.3d at 91-92; United States v. Blau, 159 F.3d 68, 74 (2d Cir. 1998).

[38]    Accord, e.g., Locascio v. United States, 395 F.3d at 56; United States v. Williams, 372 F.3d at 106; United States v. Schwarz, 283 F.3d at 92.

[39]    Accord, e.g., Locascio v. United States, 395 F.3d at 56 (Petitioner "must show that 'trial counsel chose not to undertake [the alternative strategy] because of his conflict.'"); United States v. Williams, 372 F.3d at 106; Armienti v. United States, 234 F.3d at 824.

[40]    Accord, e.g., Eisemann v. Herbert, 401 F.3d at 107; United States v. Schwarz, 283 F.3d at 92;  Armienti v. United States, 234 F.3d at 824.

Ventry v. United States, 539 F.3d at 111; United States v. Williams, 372 F.3d at 102.  Unlike actual conflicts of interest, potential conflicts do not give rise to a presumption of prejudice; rather, the defendant must prove prejudice.  See, e.g., Ventry v. United States, 539 F.3d at 111 ("If, on the other hand, [Petitioner] could prove only a potential conflict . . . , proof of prejudice to [Petitioner] would be required for him to prevail."); United States v. Williams, 372 F.3d at 102-03 ("To violate the Sixth Amendment [potential] conflicts must result in prejudice to the defendant."); United States v. John Doe No. 1, 272 F.3d at 125 (A potential conflict of interest "requires a finding of . . . prejudice."); Winkler v. Keane, 7 F.3d at 307 ("[I]n order to prove that [a potential] conflict resulted in a violation of her Sixth Amendment right to effective assistance of counsel, [petitioner] must demonstrate prejudice.").

### 1.    **Waiver**

"In most cases when a defendant is faced with a situation in which his attorney has an actual or potential conflict of interest, it is possible for him to waive his right to conflict-free counsel in order to retain the attorney of his choice."  United States v. Schwarz, 283 F.3d 76, 95 (2d Cir. 2002); accord, e.g.,United States v. Williams, 372 F.3d 96, 107 (2d Cir. 2004); United States v. Blau, 159 F.3d 68, 74 (2d Cir.1998) ("A defendant who is faced with the possibility that his attorney might become conflicted may waive the potential conflict of interest.").  Where a  defendant forgoes his right to conflict-free counsel, his waiver "will be honored if it is knowing and intelligent."  United States v. Blau, 159 F.3d at 74; accord, e.g., United States v. Williams, 372 F.3d at 107.  "Whether a waiver is knowing and intelligent depends on the circumstances of each individual case as well as the

background and experience of the accused." United States v. Blau, 159 F.3d at 74; accord e.g., United States v. Williams, 372 F.3d at 107-08; United States v. Salvagno, 343 Fed. Appx. 702, 704 (2d Cir. 2009). However, "[a]n actual or potential conflict cannot be waived if, in the circumstances of the case, the conflict is of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation." United States v. Schwarz, 283 F.3d at 95.[41]

### 2.    The Trial Court's Inquiry Obligation

"The trial court has an obligation to inquire into the facts and circumstances of an attorney's interests either in response to a timely conflict of interest objection, or 'when it knows or reasonably should know of the possibility of a conflict of interest.'"[42] Locascio v. United States, 395 F.3d 51, 56 n.2 (2d Cir. 2005) (citations omitted), cert. denied, 552 U.S. 1010, 128 S. Ct. 554 (2007); see Cuyler v. Sullivan, 446 U.S. at 346-48, 100 S. Ct. at 1717-18 ("Unless the trial court knows or

---

[41]    See also, e.g., United States v. Ward, 85 Fed. Appx. 246, 248 (2d Cir. 2004) ("[I]f the court determines that counsel has an actual conflict that is so severe as to indicate per se that the rendering of effective assistance will be impeded, or is analogous to such a conflict in 'breadth and depth,' the court must . . . disqualify counsel."); United States v. Kliti, 156 F.3d 150, 153 (2d Cir. 1998) ("If the conflict is so severe that no rational defendant would waive it, the court must disqualify the attorney.").

[42]    "[W]hen 'the trial court knows or reasonably should know that a particular conflict exists' . . . is not to be confused with when the trial court is aware of a vague, unspecified possibility of conflict, such as that which 'inheres in almost every instance of multiple representation.'" Mickens v. Taylor, 535 U.S. 162, 168-69, 122 S. Ct. 1237, 1242 (2001) (citations omitted). Indeed, "[a]bsent special circumstances, . . . trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." Cuyler v. Sullivan, 446 U.S. 335, 346-47, 100 S. Ct. 1708, 1717 (1980). Simply put, the Sixth Amendment does not require "state courts . . . to initiate inquiries into the propriety of multiple representation in every case." Cuyler v. Sullivan, 446 U.S. at 346, 100 S. Ct. at 1717.

reasonably should know that a particular conflict exists, the court need not initiate an inquiry," unless a timely objection to multiple representation has been made.); United States v. Kliti, 156 F.3d 150, 153 (2d Cir.1998) ("When the trial court knows or reasonably should know of the possibility of a conflict of interest, it has a threshold obligation to determine whether the attorney has an actual conflict, a potential conflict, or no conflict.").

In the absence of a timely objection, a "trial court's failure to conduct an inquiry to determine whether the defendant is aware of a possible conflict of interest does not by itself result in a constitutional violation requiring automatic reversal of the conviction.  Rather, even in the absence of a trial court inquiry, a defendant still must establish that the conflict adversely affected counsel's performance to obtain reversal of his conviction."  Wright v. Smith, No. 03-CV-806, 2007 WL 2412248 at *8 (N.D.N.Y. Aug. 21, 2007) (citation omitted), aff'd, 348 Fed. Appx. 612 (2d Cir. 2009); see, e.g., Mickens v. Taylor, 535 U.S. at 173-174, 122 S.Ct. at 1245 ("[T]he trial court's failure to make the Sullivan-mandated inquiry does not reduce the petitioner's burden of proof; it [i]s at least necessary, to void the conviction, for petitioner to establish that the conflict of interest adversely affected his counsel's performance.").[43/]  As Justice Kenedy explained:

---

[43/]    Similarly, the New York Court of Appeals has held that a trial judge who is aware of a situation where a conflict may exist has an obligation to "conduct a record inquiry of each defendant whose representation is potentially conflict-ridden in order to ascertain whether he or she 'has an awareness of the potential risks involved in that course and has knowingly chosen it.'" People v. McDonald, 68 N.Y.2d 1, 8, 505 N.Y.S.2d 824,827 (1986) (quoting People v. Gomberg, 38 N.Y.2d 307, 313-14, 379 N.Y.S.2d 769, 775 (1975)); accord, e.g., People v. Harris, 99 N.Y.2d 202, 211, 753 N.Y.S.2d 437, 442 (2002).  The failure to make such an inquiry, however, constitutes reversible error "only when defendant has established
(continued...)

49

> The constitutional question must turn on whether trial counsel had a conflict of interest that hampered the representation, not on whether the trial judge should have been more assiduous in taking prophylactic measures. . . . The Sixth Amendment protects the defendant against an ineffective attorney, as well as a conflicted one. It would be a major departure to say that the trial judge must step in every time defense counsel appears to be providing ineffective assistance, and indeed, there is no precedent to support this proposition. As the Sixth Amendment guarantees the defendant the assistance of counsel, the infringement of that right must depend on a deficiency of the lawyer, not of the trial judge. There is no reason to presume this guarantee unfulfilled when the purported conflict has had no effect on the representation.

Mickens v. Taylor 535 U.S. at 179, 122 S.Ct. at 1247 (Kenedy, J., concurring) (citations omitted).

### C.      Application of These Standards to Schmid and Eber-Schmid's Claims

**1.      Schmid and Eber-Schmid's Claim that the State Court's Failure to Inquire into Sklover's Potential Conflict of Interest Violated Their Right to Effective Assistance of Counsel is Without Merit**

Petitioners argue that they are entitled to habeas relief on the grounds that they were not "adequately apprised" of Sklover's potential conflict of interest because "the [trial] court never made the constitutionally required on-the-record inquiry despite the fact that [they were] jointly represented . . . in a single criminal action." (See pages 2, 18 above.) Specifically, they argue that "the Sixth Amendment dictates that a trial court make an inquiry directly at the time of the plea proceeding to jointly represented defendants into any known potential conflict, and a trial court is

---

43/      (...continued)
the existence, or probable existence, of a conflict of interest, which bears a substantial relation to the conduct of the defense." People v. Harris, 99 N.Y.2d at 211, 753 N.Y.S.2d at 442 (quotations omitted).

sufficiently apprised of a potential conflict any time defendants are jointly represented in the same proceeding." (Dkt. No. 2: Pet. Br. at 14; see also Dkt. No. 12: Pet. Traverse at 6-8.)

In addressing this claim, Justice Pickholz correctly ruled that the "failure of a court to make a Gomberg inquiry does not constitute a per se violation of defendant's right to counsel." (Dkt. No. 3: Ex. A: 5/4/09 Justice Pickholz Decision at 8.) While it is certainly true that a state court has an obligation to conduct an inquiry "'when it knows or reasonably should know of the possibility of a conflict of interest,'"[44/] the Supreme Court made clear over thirty years ago that nothing in the Sixth Amendment requires "state courts . . . to initiate inquiries into the propriety of multiple representation in every case." Cuyler v. Sullivan, 446 U.S. 335, 346, 100 S.Ct. 1708, 1717 (1980). "Absent special circumstances, . . . trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." Cuyler v. Sullivan, 446 U.S. at 346-47, 100 S.Ct. at 1717. Here, there were no "special circumstances" indicating that the Sklover's joint representation of Schmid and Eber-Schmid created a conflict of interest. Schmid and Eber-Schmid's written plea agreements, which were presented to and reviewed by Justice Pickholz, evinced their affirmative choice to proceed with mutual representation and waive any claim of conflict resulting therefrom. (See page 4 above.) Justice Pickholz thus was aware that Schmid and Eber-Schmid had been told of a possible conflict of interest, and she had no duty to inquire further. Moreover, in their plea agreements and allocutions, Schmid and Eber-Schmid both

---

[44/]   Locascio v. United States, 395 F.3d 51, 56 n.2 (2d Cir. 2005) (citations omitted), cert. denied, 552 U.S. 1010, 128 S. Ct. 554 (2007); see also cases cited at pages 47-48 above).

51

admitted using TNY's credit card to make "unauthorized" personal purchases.  (See page 7 above.)
They further confessed that although Schmid said he would repay the money, he had "no intention
of doing so."  (See page 7 above.)  Importantly, nothing contained in their plea agreements, or said
during their plea allocution, indicated the existence of, or potential for, the conflict of interest now
alleged, i.e., that Sklover's joint representation of Schmid and Eber-Schmid prevented Sklover from
advancing "Schmid's defense that his use of the credit card at issue was authorized by his wife"
because such a defense would "have tended to place all of the blame for the alleged larceny squarely
upon Eber-Schmid, and therefore increase the likelihood that she would be convicted." (Pet. Traverse
at 1, 5.)  Indeed, as Justice Pickholz noted, "[t]here was no significant possibility of a conflict here
because defendants' defenses to the crime were wholly consistent."  (See pages 17-18 above.)

Accordingly, Justice Pickholz's decision was neither contrary to nor an unreasonable
application of clearly established Supreme Court precedent.  As such, Schmid and Eber-Schmid's
claim that they are entitled to habeas relief on the grounds that they were not "adequately apprised"
of Sklover's potential conflict of interest because Justice Pickholz failed to conduct an "on-the-record"
inquiry should be DENIED.

**2.    Schmid and Eber-Schmid's Claim That They Were Denied the Effective
        Assistance of Counsel Because Their Trial Attorney Had a Conflict of
        Interest That Adversely Affected His Performance is Without Merit**

Schmid and Eber-Schmid assert that they are entitled to habeas relief because Sklover
had a conflict of interest that "adversely affected" his performance.  (See pages 2 & 18 above.)
Specifically they assert that counsel was conflicted because:

H:\OPIN\EBER-SCHMID

Schmid had a complete defense to the charge that his use of the Trees New York card was "unauthorized," as [Eber-Schmid] had given him complete authorization to charge both business and personal expenses to the card.  Application of this defense would have focused the prosecution on [Eber-Schmid] and would have forced Schmid to testify against his wife.

(Dkt. No. 2: Pet. Br. at 17.)  Because he owed a duty of loyalty to Eber-Schmid, petitioners allege that Sklover failed to inform them of Schmid's defense.  (Pet. Br. at 9-10; Dkt. No. 12: Pet. Traverse at 5-6.)  Had Schmid and Eber-Schmid been aware that Schmid had a "complete defense" to the charges, they assert that they would not have pled guilty.  (Dkt. No. 3: Ex. S: 3/17/09 Schmid Reply Aff. ¶¶ 7-8; Ex. T: 3/17/09 Eber-Schmid Reply Aff. ¶¶ 5-6; Pet. Traverse at 5.)

In dismissing this claim, Justice Pickholz stated that "[i]n order to prevail upon a claim that counsel had a conflict of interest arising out of concurrent multiple representation, a defendant need not show specific prejudice, but must establish that the conflict bore 'a substantial relation to the conduct of his defense.'"  (Ex. A: 5/4/09 Justice Pickholz Decision at 8; see page 16 above.)  According to Justice Pickholz, Schmid and Eber-Schmid failed to "demonstrate[] that [a] conflict operated on [their] representation":

There was no significant possibility of a conflict of interest here because defendants' defenses to the crime were wholly consistent with each other.  Defendant Eber-Schmid argues that she did not steal from [TNY] because she was ultimately responsible for all of the charges on the card.  Defendant Schmid contends that all of his charges were authorized by his wife.  Nowhere in the instant motion does defendant Eber-Schmid dispute his claim.  If she indeed authorized all of his charges, and as she argues, she was responsible for them, then all of defendant Schmid's charges also did not constitute thefts. . . .  As they did not advance inconsistent defenses, do not do so now, and received equal, favorable pleas and sentences, they have not established that the alleged conflict operated on their representation.

(5/4/08 Justice Pickholz Decision at 8-9.)

To determine whether Schmid and Eber-Schmid are required to prove actual prejudice, or merely show that a conflict adversely affected Sklover's performance, the Court must first determine whether Sklover labored under an actual or potential conflict of interest.  (See Point III.B. above.)[45/]  Here, the alleged conflict stems from the mere possibility that Sklover might have had inconsistent duties at some point in the future, to wit, that if both Schmid and Eber-Schmid went to trial, Schmid's potential defense would be detrimental to Eber-Schmid.  (See page 52 above.)  An actual conflict of interest, however, cannot be premised upon a "'theoretical division of loyalties,'" United States v. Salvagno, 343 Fed. Appx. 702, 704 (2d Cir. 2009) (quoting Mickens v. Taylor, 535 U.S. 162, 171, 122 S. Ct. 1237, 1239 (2001)); it requires an "actual lapse in representation" that results from an attorney "actively represent[ing] conflicting interests." Cuyler v. Sullivan 446 U.S. 335, 349, 100 S. Ct. 1708, 1719 (1980); accord, e.g., Rice v. Senkowski, No. 04-CV-335, 2007 WL 2789504 at *10 (N.D.N.Y. Sept. 24, 2007) (The mere "'possibility of conflict is insufficient to impugn a criminal conviction.'"); Deleon v. Duncan, 99 Civ. 9086, 2001 WL 1029400 at *13 (S.D.N.Y. Sept. 5, 2001), report & rec. adopted, 2002 WL 1997892 (S.D.N.Y. Aug. 28, 2002); Rivera v. United States, 893 F. Supp. 1238, 1247 (S.D.N.Y. 1995).

---

[45/]    Schmid and Eber-Schmid do not indicate clearly whether they believe the alleged conflict constitutes an actual or potential conflict.  (Compare Pet. Br. at 16 (referring to the conflict as an actual one) with Dkt. No. 1: Pet. ¶ 12(1) (referring to the conflict as a potential one). However, it is obvious that the alleged conflict does not fall into either of the two narrow categories of cases characterized as per se conflicts if interest (see cases cited at pages 42-43 above): Schmid and Eber-Schmid do not allege that Sklover was unlicensed or that he was somehow implicated in the charged crimes.

Moreover, as Justice Pickholz noted, there was not even a possibility of Sklover having divided loyalties because Schmid and Eber-Schmid's potential defenses were "wholly consistent." According to Eber-Schmid, as executive director of TNY she was "in charge of virtually all of the organization's daily operations" and used her own "personal credit history" to obtain the American Express card on TNY's behalf.  (Dkt. No. 3: Ex. R: 12/5/08 Eber-Schmid Aff. ¶ 5.)  Because "the ultimate responsibility" for paying the credit card bill was hers, Eber-Schmid alleges that her personal use of the card was not criminal.  (Id.)  Accordingly, if Eber-Schimd authorized Schmid's use of the card, and was herself responsible for those charges, it follows that Schmid's charges also were not criminal.   Accordingly, their defenses were entirely consistent.

Schmid and Eber-Schmid's claim that Schmid's "authorization defense" would somehow "place all of the blame . . . squarely upon Eber-Schmid, and therefore increase the likelihood that she would be convicted" (see page 51 above), is a red herring.  As Schmid and Eber-Schmid themselves concede, Eber-Schmid "would have still been charged with using the credit card in a manner that had not been approved by" TNY whether or not Schmid asserted the "authorization defense."  (Pet. Traverse at 5.)  Eber-Schmid claims that if Schmid raised the authorization defense, his "testimony would likely incriminate [her] with regard to the charges against" her.  (Dkt. No. 8: 11/4/09 Ray Aff. Ex. B: 11/4/09 Eber-Schmid Aff. ¶ 3.)  The Court disagrees.  Eber-Schmid's defense was never that she didn't use (or authorize use of) the credit card, but rather that she was permitted to do so as executive director and, in any event, had repaid all personal charges.  (See pages 9-10, 54 above.)  Thus, Schmid's assertion of the "authorization defense" could have no bearing on Eber-

Schmid's guilt, and so there was no incentive for Sklover to discourage Schmid from asserting it. Accordingly, Schmid and Eber-Schmid have failed to make out the existence of even a potential conflict of interest.

Even assuming that Schmid's "authorization defense" created a potential conflict of interest, Schmid and Eber-Schmid have failed to demonstrate how that conflict prejudiced their case.[46]   With regard to Eber-Schmid, it is incomprehensible how knowledge of Schmid's "authorization defense" would have dissuaded her from pleading guilty:  according to petitioners, the alleged conflict arose precisely because Schmid's assertion of the "authorization defense" would have "tended to place all of the blame for the . . . larceny squarely upon Eber-Schmid, and therefore increase the likelihood that she would be convicted."   (See page 51 above.)  Thus, it seems more likely, not less, that Eber-Schmid would have pled guilty in light of Schmid's "authorization defense." With regard to Schmid, there is no reason to believe that the so called "authorization defense" would have acquitted him of the charges.   Indeed, it is implausible that a reasonable juror would find Schmid's taking tens of thousands of dollars from a not-for-profit organization was justified simply because his wife said it was okay.  As such, Schmid's conclusory assertion that he would have forgone a favorable plea agreement and instead gone to trial (even at the risk of incarceration), merely because

---

[46]   Unlike actual conflicts of interest, potential conflicts do not give rise to a presumption of prejudice; instead Schmid and Eber Schmid "must show that there is a reasonable probability that, but for counsel's errors, [they] would not have pleaded guilty and would have insisted on going to trial.'"  Moore v. United States, 00 Civ. 4560, 98 Cr. 833, 2001 WL 253432 at *11 (S.D.N.Y. Mar. 15, 2001) (Peck, M.J.) (quoting Hill v. Lockhart, 474 U.S. at 59, 106 S. Ct. at 370).

he had knowledge of a meritless defense, is dubious.  In light of Schmid's testimony that he routinely used TNY's credit card for personal expenses, was aware that such use was "totally unauthorized by TNY's board of directors" and had no intention of repaying the money he took (see page 7 above), there is no reason to believe that Sklover's failure to disclose the "authorization defense" prejudiced his case.

In any event, Schmid and Eber-Schmid were warned of the dangers inherent in multiple concurrent representation and affirmatively waived any conflict of interest arising therefrom. (See pages 12-14 above.)  First, Schmid and Eber-Schmid were repeatedly advised by their attorneys why joint representation "can be prejudicial in the case of two people defending against charges arising from one set of alleged criminal activities."  (See pages 12-13 above.)  Similarly, ADA Kale "raised the issue" of a potential conflict of interest arising from their mutual representation and was told by both Schmid and Eber-Schmid that they wished to proceed with the same lawyer.  (See pages 13-14 above.)  Finally, Schmid and Eber-Schmid signed plea agreements confirming their understanding that  Sklover was jointly representing them, that it was their "affirmative[] cho[ice] to have mutual representation" and that they "waive[ed] any claim of conflict [arising from the Sklover firm's] mutual representation."  (See page 4 above.)  Besides their own self-serving statements to the contrary, every indication supports the conclusion that their waivers were knowing and voluntary. (See cases cited at pages 34-35, 46-47 above.)

Accordingly, Schmid and Eber-Schmid's claim that Sklover's undisclosed conflict of interest adversely affected his performance should be DENIED.

H:\OPIN\EBER-SCHMID

### 3.    Schmid and Eber-Schmid's Claim That They Were Denied Effective Assistance of Counsel Because Their Trial Counsel Failed to Adequately Investigate Exculpatory Evidence is Without Merit

Schmid and Eber Schmid claim they were denied the effective assistance of counsel because Sklover failed to investigate "documentary evidence that . . . would have exculpated" them. (See pages 2 & 18 above.) Specifically, they allege that documents in TNY's possession – obtained while defending TNY's civil lawsuit against them – show that they "promptly and regularly repaid [TNY] for all personal expenses that were charged to the card." (Dkt. No. 3: Ex. P: 12/5/08 Ray Aff. ¶¶ 6-7; Ex. Q: 12/5/08 Schmid Aff. ¶¶ 6-8; Ex. R: 12/5/08 Eber-Schmid Aff. ¶¶ 6-7.) Although Schmid and Eber-Schmid told Sklover about these records, they claim that he made no attempt to review them. (12/5/08 Schmid Aff ¶ 7; 12/5/08 Eber-Schmid Aff. ¶ 7.)

Justice Pickholz denied this claim because Schmid and Eber-Schmid had "provide[d] no independent support for their contentions that [Sklover] failed to investigate documentary evidence that would have exculpated them." (Ex. A: 5/4/09 Justice Pickholz Decision at 9; see pages 17-18 above.) Justice Pickholz dismissed the notion that "the many pages of spreadsheets and photocopies of checks that they . . . appended to their reply papers show that they repaid all of the charges attributed to them," because "[i]n view of the admissions in their plea agreements and plea allocutions, there is no reason to believe these documents exonerate them in fact." (5/4/09 Justice Pickholz Decision at 9-10.) Finally, Justice Pickholz determined it "immaterial that the documents may show that some of the charges were repaid. . . . Even if they could show that the $52,000 figure was not exact, that did not affect their liability. The fact remained that [Schmid and Eber-Schmid]

charged personal items on the card and evinced no intention of reimbursing [TNY] for them." (5/4/09 Justice Pickholz Decision at 9-10.) Finally, there is no doubt that Eber-Schmid, the executive director of TNY, knew that TNY had these financial records, and yet she agreed to plead guilty.

The Supreme Court has stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066 (1984). Where there is no reason to investigate further, counsel is not ineffective for choosing not to:

> Although in some cases a reasonable investigation will require defense counsel to "speak before trial with readily-available fact witnesses whose non-cumulative testimony would directly corroborate the defense's theory of important disputes," Pavel v. Hollins, 261 F.3d 210, 221 (2d Cir. 2001), a decision not to pursue an investigation may not be challenged as unreasonable "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless." Strickland, 466 U.S. at 691. In other words, the duty to investigate "does not . . . compel defense counsel to investigate comprehensively every lead or possible defense . . . or 'to scour the globe on the off-chance something will turn up.'" Greiner v. Wells, 417 F.3d 305, 321 (2d Cir. 2005) (quoting Rompilla v. Beard, 545 U.S. 374, 383, 125 S. Ct. 2456 (2005))[, cert. denied, 546 U.S. 1184, 126 S. Ct. 1363 (2006)]. To the extent that counsel determines that additional investigation "would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Id. at 321 (quoting Strickland, 466 U.S. at 691).

Cheng Kang Shi v. Connolly, No. 06 CV 2093, 2007 WL 4380276 at *20 (E.D.N.Y. Dec. 13, 2007).

As a preliminary matter, the Court has no reason to believe that the documents in question actually prove that Schmid and Eber-Schmid "promptly and regularly repaid [TNY] for all personal expenses that were charged to the card." (See page 57 above.) As Justice Pickholz noted,

"absen[t] . . . financial analysis, [these documents] are all but impenetrable [and] [i]n view of the admissions in their plea agreements and plea allocutions, there is no reason to believe that these documents exonerate [petitioners] in fact."  (5/4/09 Justice Pickholz Decision at 9-10.)

Even assuming that the documents do prove, as Schmid and Eber-Schmid claim, that they repaid some $74,800.13 to TNY (12/5/08 Schmid Aff ¶ 4; 12/5/08 Eber-Schmid Aff. ¶ 5; Ex. Q: 3/18/09 Schmid Aff. ¶ 6), Sklover was not ineffective for failing to obtain or review them.  "[A]s a general matter, when there is 'reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.'"  Greiner v. Wells  417 F.3d at 321 (quoting Strickland v. Washington, 466 U.S. at 691, 104 S. Ct. at 2066).  Here, Schmid and Eber-Schmid were accused of Stealing over $450,000 from TNY.  (See pages 3, 12 above.)  During its investigation, the DA's office identified over $145,000 worth of charges on TNY's American Express card attributable to Schmid and Eber-Schmid's personal purchases.  (See Ex. X: 7/31/07 Pinto Email & page 13 above.)  During plea negotiations, ADA Kale provided the Sklover firm with a list of over $83,000 worth of such charges; although the remaining $67,000 worth of charges were likely criminal, ADA Kale limited the list to those charges deemed "brazen thefts."  (See page 13 above.)  At Schmid's urging, co-counsel David Stand disputed "line by line" the charges on the list, suggesting they had either been repaid or were "legitimate business expenses."  (See page 13 above.)  Over time, however, ADA Kale became frustrated at this "'nitpicking.'"  (See page 13 above.)  According to ADA Kale, the list provided was only a subset of the unauthorized credit card charges, which was itself a subset of the Schmid and

Eber-Schmid's total criminal activity.[47/]  If Schmid and Eber-Schmid wanted to dispute every charge listed, ADA Kale threatened to bring the case before a grand jury for indictment.  (See pages 13-14 above.)

Accordingly, the investigation of documentary evidence showing repayment of approximatelty $75,000 would have been of limited value: there would still have been over $70,000 worth of charges on the American Express card that, while not "brazen," were believed to constitute thefts.  (See pages 13, 59 above.)  As such, it is unlikely that revelation of these so called exculpatory documents would have caused the DA's office to dismiss the criminal charges.  More importantly, had the Sklover firm continued to dispute the amount in controversy, ADA Kale would have revoked the plea offer, sought indictment, and petitioners would have faced a risk of incarceration.  Given ADA Kale's frustration at the "back and forth exchanges" and Schmid and Eber-Schmid's keen desire to avoid incarceration (see pages 13-15 above), it was reasonable for Sklover to conclude that further investigation would have been detrimental to Schmid and Eber-Schmid's interests.

In any event, Schmid and Eber-Schmid themselves wrote the reimbursement checks that are now alleged to prove their innocence.  (See 12/5/08 Schmid Aff. ¶ 6; 12/5/08 Eber-Schmid Aff.  ¶ 5; Ex. AB: 3/17/09 Schmid Reply Aff.; Ex. C: Payment Records.)  And Eber-Schmid, as TNY's executive director, was fully familiar with TNY's financial and other records.  As such, it strains credulity that Schmid and Eber-Schmid were not aware of the documents' existence prior to

---

[47/]     In addition to the American Express Charges, ADA Kale had proof that Schmid and Eber-Schmid had stolen over $17,000 from TNY bank accounts by drafting and cashing checks made payable to "cash."  (See page 13 above.)

pleading guilty.  Sklover's alleged "failure to investigate" could not have prejudiced petitioners' defense, or otherwise influenced their decision to plead guilty.  See, e.g., Contino v. United States, 07 Civ. 7084, 2007 WL 4591999 at *11-12  (S.D.N.Y. Dec. 28, 2007) (Attorney not ineffective for failing to investigate the amount of money stolen by petitioner because, inter alia, petitioner "did not need his attorney to tell him what he billed or earned as a result of the criminal conduct he was charged with having committed."), appeal dismissed, 535 F.3d 124 (2d Cir. 2008); Collins v. Superintendent Conway, 04 Civ. 4677, 2006 WL 1114053 at *4 (S.D.N.Y. Apr.  26, 2006) ("Petitioner's claim for ineffective assistance of counsel is likewise unavailing. Petitioner claims his counsel failed to discover the actual lineup records, and that this constitutes ineffective assistance of counsel. Petitioner's claims are entirely dependent on information that the Petitioner himself had at every stage of the proceedings after the alleged lineups. Any failure to assert these claims prior to his guilty plea is therefore a failure of Petitioner not to communicate with his counsel, not a failure of counsel.").

Accordingly, Schmid and Eber-Schmid's claim that they were denied the effective assistance of counsel because Sklover failed to investigate exculpatory evidence should be DENIED.

4.     **Schmid and Eber-Schmid's Claim That They Were Denied Effective Assistance of Counsel Because Their Trial Counsel Did Not Adequately Inform Them of the Collateral Consequences of Their Guilty Pleas Is Without Merit**

Schmid and Eber Schmid claim that they were denied the effective assistance of counsel because Sklover did not adequately inform them of the collateral consequences of their guilty pleas.  (See pages 2 & 18-19 above.)  Specifically, Schmid and Eber-Schmid allege that Sklover

"affirmatively misled" them by telling them that "payment of restitution in the criminal case would take restitution 'off the table' in the collateral civil case, while [also] failing to mention the devastating collateral consequences of the guilty plea with regard to [their] liability in the civil matter." (See pages 2 & 18-19 above.) According to Schmid and Eber-Schmid, "[h]ad anyone advised [them] that by pleading guilty to the crime of larceny in the 4th degree that it would have the effect of an admission of liability in a civil lawsuit with [TNY], [they] would have not chosen to plead guilty and would have instead risked the possibility of indictment and trial." (Dkt. No. 3: Ex. S: 3/17/09 Schmid Reply Aff. ¶ 6; Ex. T: 3/17/09 Eber-Schmid Reply Aff. ¶ 4.)

Justice Pickholz rejected this claim on the grounds that Schmid and Eber-Schmid had "provide[d] no independent support . . . that [Sklover] failed to advise them that by pleading guilty they would adversely affect their civil case" (Ex. A: 5/4/09 Justice Pickholz Decision at 9), and because their "contentions [were] contradicted by the Kale and Sklover affidavits." (5/4/09 Justice Pickholz Decision at 6.) Justice Pickholz found it telling that "[a]lthough [they] submitted an affidavit from Mr. Stand, it is silent as to all of the material issues and fails to support a single one of their claims." (5/4/09 Justice Pickholz Decision at 6, 9.)

As with their other claims, Schmid and Eber-Schmid's assertion that Sklover failed to inform them of the collateral consequences of their guilty pleas are wholly reliant on their own self-serving affidavits. However, as Justice Pickholz correctly noted, self-serving allegations of ineffective assistance of counsel are not enough to overturn a knowing and voluntary guilty plea. See, e.g., United States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998) (Strickland's "but for" test requires

"some further 'objective evidence'" beyond a petitioner's "self-serving, post-conviction testimony."); Potter v. Green, No. 04-CV-1343, 2009 WL 2242342 at *15 (E.D.N.Y. July 24, 2009) ("Petitioner's only evidence showing that 'but for' counsel's error, Petitioner would not have pled guilty is Petitioner's affidavit; however this statement alone is insufficient."); Grullon v. United States, 99 Civ. 1877, 2004 WL 1900340 at *6 (S.D.N.Y. Aug. 24, 2004) ("In considering an ineffective counsel claim, a court need not accept a petitioner's uncorroborated, self-serving testimony as true."); see also Slevin v. United States, 71 F. Supp. 2d 348, 356 n.7 (S.D.N.Y.1999) ("The Second Circuit has invariably affirmed a trial judge's right to discount a habeas petitioner's uncorroborated, self-serving testimony.") (citing cases), aff'd, 234 F.3d 1263 (2d Cir. 2000).

        Moreover, the assertion that Sklover misled or otherwise failed to inform Schmid and Eber-Schmid of the collateral consequences their guilty pleas would have on TNY's civil case is directly contradicted by Sklover's affidavit stating that he told Schmid and Eber-Schmid that "the issue of liability would likely be precluded once they pleaded guilty in connection with the criminal matter," but that any amount they paid in restitution to satisfy the criminal case would be subtracted from the damage award in the related civil action.  (See page 14 above.)  In light of Sklover's affidavit, the Court need not credit Schmid and Eber-Schmid's allegations.  See Castrillo v. Breslin, 01 Civ. 11284, 2005 WL 2792399 at *13-14 (S.D.N.Y. Oct. 26, 2005) (Where a "habeas court is faced with self-serving allegations that are contradicted by a credible affirmation by a trial attorney, it may choose to credit the attorney and dismiss the ineffective assistance of counsel claim . . . ."  );

accord, e.g., United States v. Brumigin, No. Cr-03-910, 2007 WL 3353510 at *2 (E.D.N.Y. Nov. 7, 2007); Thai v. United States, No. 99 CV 7514, 2007 WL 13416 at *6 (E.D.N.Y. Jan. 2, 2007).

Even if the Court credited Schmid and Eber-Schmid allegation that Sklover failed to inform them that their guilty pleas would have an adverse impact on the collateral civil litigation, Schmid and Eber-Schmid have not shown that Justice Pickholz's denial of this claim violated clearly established Supreme Court precedent.[48/] Schmid and Eber-Schmid have not cited any Supreme Court cases holding that the Sixth Amendment requires a criminal defense attorney to advise his client that a guilty plea will constitute an admission of liability in a corresponding civil case, nor could they:

> [C]riminal convictions can carry a wide variety of consequences other than conviction and sentencing, including civil commitment, civil forfeiture, the loss of the right to vote, disqualification from public benefits, ineligibility to possess firearms, dishonorable discharge from the Armed Forces, and loss of business or professional licenses. A criminal conviction may also severely damage a defendant's reputation and thus impair the defendant's ability to obtain future employment or business opportunities. All of those consequences are 'seriou[s],' but [the Supreme] Court has never held that a criminal defense attorney's Sixth Amendment duties extend to providing advice about such matters.

---

[48/]   Under its "contrary to" clause, AEDPA prohibits a federal court from granting habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Accordingly, there can be no habeas relief when there is no Supreme Court precedent to be contradicted or unreasonably applied. Yung v. Walker, 341 F.3d 104, 110 (2d Cir. 2003) ("A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent."); DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002) (same); see also Lockhart v. Chandler, 446 F.3d 721, 724 (7th Cir. 2006) (Where there is no Supreme Court precedent, a petitioner "faces an impossible hurdle in showing the state court contradicted, or unreasonably applied, clearly established federal law."), cert. denied, 549 U.S. 1110, 127 S. Ct. 928 (2007).

Padilla v. Kentucky, — S. Ct. —, 2010 WL 1222274 at *12 (Mar. 31, 2010) (Alito, J., concurring) (citations omitted).

      Unlike lower federal courts, the Supreme Court has "never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance.'" Padilla v. Kentucky 2010 WL 1222274 at *6 & n.9 (noting that the 1st, 4th, 5th, 10th, 11th and DC Circuits have ruled that "'collateral consequences are outside the scope of representation required by the Sixth Amendment'" but declining to decide whether such a "distinction is appropriate."); see also Wilson v. McGinnis 413 F.3d 196, 199 (2d Cir. 2005)("The Supreme Court has not defined which consequences of a guilty plea are 'direct' and therefore must be disclosed to the defendant, and which consequences are collateral and need not be conveyed to the defendant prior to his plea.").  Rather, the Supreme Court has limited the scope of the Sixth Amendment to those matters "intimately related to the criminal process."  Padilla v. Kentucky, 2010 WL 1222274 at *6 ("Although removal proceedings are civil in nature, deportation is nevertheless intimately related to the criminal process.  Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century. . . .  Thus, we find it 'most difficult' to divorce the penalty from the conviction in the deportation context. . . .  The collateral versus direct distinction is thus ill-suited to evaluating a Strickland claim concerning the specific risk of deportation.") (citations omitted).[49]

---

[49]    See Padilla v. Kentucky, 2010 WL 1222274 at *19 (Scalia, J., dissenting) (The Supreme Court has limited the Sixth Amendment to "those matters germane to the criminal prosecution at hand - to wit, the sentence that the plea would produce, the higher sentence that conviction after trial might entail, and the chances of such a conviction."); McMann v.
                             (continued...)

The Court finds that Schmid and Eber-Schmid have failed to carry their burden under AEDPA to show that Justice Pickholz's decision was contrary to, or an unreasonable application of, clearly established federal law as defined by the Supreme Court precedent.  Accordingly, Schmid and Eber-Schmid's claim that they were denied the effective assistance of counsel because they were not adequately apprised of the collateral consequences of their guilty plea should be <u>DENIED</u>.

## CONCLUSION

For the reasons set forth above, both Schmid and Eber-Schmid's habeas petitions should be <u>DENIED</u> in their entirety and certificates of appealability should not be issued.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  <u>See also</u> Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Barbara S. Jones, 500 Pearl Street, Room 1920, and to my chambers, 500 Pearl Street, Room 1370.

---

[49]/     (...continued)
<u>Richardson</u>, 397 U.S. 759, 769-70, 90 S.Ct. 1441, 1448-49 (1970) (describing the "range of competence demanded of attorneys in criminal cases"); <u>see also</u> <u>Hill</u> v. <u>Lockhart</u>, 474 U.S. 52, 56-57, 106 S.Ct. 366, 369 (1985) (A "defendant who pleads guilty upon the advice of counsel 'may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in <u>McMann</u>.'") (citing <u>Tollet</u> v. <u>Henderson</u>, 411 U.S. 258, 267, 93 S.Ct. 1602, 1608 (1973)); <u>Brady</u> v. <u>United States</u>, 397 U.S. 742, 755, 90 S.Ct. 1463, 1472 (1970) (A plea is voluntary and intelligent if it is entered into by one with full awareness of its "direct consequences.").

Any requests for an extension of time for filing objections must be directed to Judge Jones (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:      New York, New York
            April 22, 2010

                                             Respectfully submitted,

                                             _____
                                             Andrew J. Peck
                                             United States Magistrate Judge

Copies to:   Robert Ray, Esq.
             Jacob Boyd Radcliff, Esq.
             Ashlyn Dannelly, Esq.
             Lisa Fleischmann, Esq.
             Judge Barbara S. Jones

H:\OPIN\EBER-SCHMID